Frank **SCHONFELD** et al., Plaintiffs,

v.

S. Frank **RAFTERY** et al., Defendants.

No. 67 Civ. 1361.

United States District Court
S. D. New York.

June 16, 1967.

Burton H. Hall, New York City, for plaintiffs.

Barr & Peer, Washington, D. C. for defendant Brotherhood; David S. Barr, Washington, D. C., of counsel.

Michael A. Buonora, New York City, for defendant District Council No. 9; Michael A. Buonora, New York City, John L. Buonora, New York City, of counsel.

Charles Donahue, Sol., James R. Beaird, Associate Sol., Rufus W. McKinney, Atty., for United States Department of Labor, amici curiae.

FRANKEL, District Judge.

The defendant Brotherhood of Painters, Decorators and Paperhangers of America provides in its Constitution for a network of regional district councils exercising a broad range of executive and legislative power over local unions within their jurisdiction. Defendant District Council No. 9 functions in this capacity in New York City. On October 19, 1966, after a turbulent history to be outlined below, S. Frank Raftery, General President of the Brotherhood, placed the District Council under a special trusteeship, naming John Damery, one of the Brotherhood's general representatives, as Special Trustee.

On April 6, 1967, the plaintiffs, members (in most or all cases, for many years) of local unions affiliated with de-

fendant District Council, filed this action to enjoin the continued functioning of the trusteeship, to prevent the Trustee from indefinitely postponing a scheduled election for the post of District Council Secretary-Treasurer, and for related relief. Invoking the court's jurisdiction under Sections 302 and 304 of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. §§ 462 and 464, and under Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, they charged that the trusteeship had not been imposed for a lawful purpose, but had been "established in fact for the purposes of consolidating the power of certain corrupt union officers, of dissipating the power and resources of the Council, and of preventing the growth of competing political elements within the Council, and of preventing the rank-and-file members of local unions composing the Council from cleaning up the corrupt conditions and practices that exist in the affairs of the Council."

Within a week after bringing the suit, plaintiffs moved on lengthy and detailed affidavits for a preliminary injunction. To sketch them only briefly here, the affidavits made, and documented, allegations that there had been long years of corruption in the District Council; a long tenure of tyrannical repression by the Council's Secretary-Treasurer, Martin Rarback; management of the Council's affairs over many years for the personal interests of Rarback and his allies at the expense of the working membership; and a steady pattern of indifference or collusion by the Brotherhood despite numerous appeals by dissident individual members. The trusteeship had been imposed, plaintiffs asserted, only after Rarback had been indicted in New York the day before for bribery and collusion of the kind alleged here. Furthermore, plaintiffs undertook to show, the Trustee had done nothing to correct the evils in the District Council's affairs or to investigate the widespread charges of corruption and autocratic rule by its officers. Instead, it was charged,

while he had suspended all the officers upon assuming the trusteeship, he had re-installed all of them except Rarback immediately, and had named Rarback shortly afterwards to a post of power and importance. It was alleged, in sum, that the trusteeship amounted to a "front" or "cover" for retaining control by the discredited—or at least seriously suspect— Rarback regime.

In a long opposing affidavit by the Trustee and a briefer one (incorporating the Trustee's) by General President Raftery, defendants denied stoutly that the trusteeship was anything but a good-faith and lawful measure to repair the parlous condition of the District Council. The Trustee reported a series of achievements during his tenure—revision of Council by-laws, an educational program, revitalized organizing efforts, a new (and impartial) Council newsletter, among other things. He swore to his own good faith and that of the Brotherhood in installing him. But the opposing affidavits left wholly or partly unanswered questions of a serious nature. What, if anything, had the Trustee done about the alleged problems of corruption? What investigation, if any, had he made before reinstating all the members of Rarback's administration other than Rarback himself? What had led to the new role of Rarback and how important was that role? How did it happen that after years of inaction, the indictment of Rarback had led to the instantaneous imposition of the trusteeship? To what extent had the procedures required by law been followed in declaring and continuing the trusteeship?

These and other unanswered questions to be noticed below posed issues of substance. It became clear that an evidentiary hearing would be required, and the court ordered one. With the acquiescence of the parties, the court invited the Secretary of Labor, through his Solicitor, to appear as amicus curiae. The invitation was accepted. Counsel for the Secretary attended the hearing, extending over seven court days, supplied some pertinent documentation, and have filed

a post-hearing brief, for which the court is grateful although the Department's ultimate submission in favor of defendants is rejected.[1]

Since it was apparent that the ruling on the motion for a preliminary injunction was likely to be in effect the ultimate decision in the case, the court proposed for discussion that we proceed directly to the final adjudication in accordance with Fed.R.Civ.P., Rule 65(a) (2). Plaintiffs favored that course. Defendants opposed it. Recognizing its power under the cited Rule to *order* a final hearing on the merits, the court perceived no prospect of substantial gain in doing so over defendants' objection. Accordingly, whether or not it makes a real difference, the hearing was held solely for the purpose of the preliminary injunction application. Now, having studied the extensive record of factual and legal submissions, the court reaches the following findings, conclusions, and decision.

## FINDINGS OF FACT

### 1. The pre-trusteeship situation

Since at least 1960, probably for a number of years before that, and up to the imposition of the trusteeship on October 19, 1966 (to stop there for the moment), District Council No. 9 was repressively governed, and the interests of its constituent union membership poorly served and frequently betrayed, under the dominance of Martin Rarback, its Secretary-Treasurer and chief officer,[2] and those allied with him in positions of power. Democratic procedures were ignored. The Council bylaws, of little moment to a dictatorial regime, were in a state of scattered disarray. Dissident members, seeking a voice in the manage-

ment of Council affairs or an opportunity to vie for Rarback's office, were fought ruthlessly with all the power available to entrenched officials.

The Council's publication, the "District Council 9 News," served as Rarback's personal organ and propaganda outlet. It was used to vilify his opponents and trumpet his virtues at all (especially election) times. Opposition views were not seen in it except as Rarback purported to state, in order to refute, them. Appeals to the Brotherhood on this, as on many other subjects, were constant, and uniformly futile.

From 1953 on there was only a single election year, 1961, in which a candidate (plaintiff Schonfeld) managed to run the nomination gauntlet and stand as a candidate against Rarback. In order to be a candidate in the District Council election, an aspirant must win nomination by a vote in his local union. Among the devices employed by the Rarback forces to perpetuate his dynasty was the practice of having people in his camp compete for the nomination in their local unions. When such people obtained the nomination, as they did from time to time, they would obligingly announce that they were declining to run against the esteemed incumbent. Another Rarback stratagem was the use of transfers from local to local on the eve of elections to organize a favorable electorate.

When Rarback did for once face opposition, in the 1961 election, his opponent, Schonfeld, was confronted with a long, and probably critical, delay in obtaining the mailing list so that he might distribute campaign literature. Finally, eight days before the election, he was permitted to go to the offices of the

---

1. As will appear, the weakest area of the Secretary's brief, probably because of the severe time pressure, is in its thin treatment of the facts, largely and uncritically rested upon the testimony of the Trustee. Even so, isolating only one (though a major one) of the factors weighing against defendants, the brief says (pp. 17–18) that "Rarback's appointment under the circumstances *permits* an inference of bad faith on the part

of the International." (Emphasis added.) Weighing an array of further facts overlooked (or, at least, not mentioned) in the Labor Department's brief, the court concludes that the adverse inference is compelling rather than merely permissible.

2. The Council has an unsalaried President, Louis Caputo, who is formally assigned as an "administrative aide" to the Secretary-Treasurer, the chief official.

Painting Industry Insurance Fund and copy the list there by hand. Not surprisingly, Rarback's mailings, in envelopes typed probably (though not certainly) by Council personnel,[3] were sent to the membership before Schonfeld's.

Following the 1961 vote, and on numerous other occasions, Schonfeld and others dissidents appealed to the Brotherhood for correction or discipline based upon election and other irregularities. With rare and trivial exceptions, the appeals were rejected.

The aftermath of the 1961 election presented one of the repeated occasions when Rarback and his colleagues used the machinery of union discipline to wreak punishment upon dissenters. Schonfeld and some twenty of his supporters were charged with such offenses as unlawful resort to extra-union remedies and blemishing the union's good name. Denied the right of cross-examination and the right to produce witnesses (or testify) in their own behalf, they were convicted and ordered to pay substantial fines ($250 in Schonfeld's case). Appeals to the Brotherhood's General Executive Board were characteristically unavailing. On appeal to this court, as an incident of one of the numerous lawsuits members have brought to seek justice in the affairs of the District Council,[4] Schonfeld fared better. Enjoining enforcement of the punishments—in a decision later obeyed, and never questioned, by the District Council—Judge Murphy observed: "We are compelled to agree with plaintiffs' statement in its affidavit that 'if this be due process the moon is made of green cheese.'" Yochim and Schonfeld v. Caputo, 61 Civ. 2223, p. 3 (Oct. 24, 1962).

Apparently as a further response to the unaccustomed burden of a contested election in 1961, Rarback engineered a bylaw amendment before the 1964 election abolishing the long-standing requirement that members have their photographs in their union books, an obviously sensible and convenient means for checking questioned identity at the polling place. The result has been to facilitate the practice, vividly demonstrated to have continued into the Trustee's era, of stuffing the ballot boxes with fictitious votes. In June of 1965, in anticipation of pending local union elections, anti-Rarback candidates pressed for a system of control cards and a requirement that voters sign a register at the time of balloting. General Representative Altman, to whom the Brotherhood has steadily referred appeals and disputes from the District Council for supposedly impartial disposition, undertook to mediate on this occasion. The pro-Rarback people finally stated they would relent to the point of agreeing to either control cards or signatures. The dissidents, a number of whom believed that either device alone would be futile, retired to caucus. Agreeing to accept only signatures, they returned to take that offered alternative. The Rarback forces reneged. Altman, announcing that the dissidents were not really entitled to anything after all, walked out and left the situation unchanged.

The incident is illuminating in itself, but it is also illustrative. As noted above, General Representative Altman has functioned for some years as the ostensible giver of justice and voice of higher authority from the Brotherhood to District Council 9. Grievances have been "resolved" by reference to him from the Brotherhood's national headquarters. He has played his role repeatedly in one of two ways: (1) mostly, by passionate and intimidating support of the Rarback group, or (2) by professed inability to do anything about anything. And this gamut, from strident partisanship to ostensibly impotent "neutrality," has

---

3. The inference is drawn with reasonable confidence from the testimony about the typwritten mailings together with the whole pattern of Rarback's dealings with the Council as his personal domain.

4. The significance for the present case of some of this extensive litigation is considered further below.

typified the Brotherhood's position over the years.

Among the incidents Altman has witnessed with apparent indifference have been at least one beating of a member attempting to be heard at a local meeting; the repeated silencing of opposition views at meetings; and blatant improprieties in local balloting. More positively, he has supported Rarback's objectives; attacked dissidents like the plaintiffs for such alleged subversion as making criminal charges (resulting in indictments) against the leadership; and personally engaged in intimidation, at the very time of voting, to insure an electorate favorable to Rarback.

While it has dealt harshly with members who are not compliant, the Rarback administration appears to have been an amiable one for at least many employers who have not been zealous to honor the rights of union members. Contract provisions governing hours, safety and other working conditions have been violated on a wide scale. Inspection and enforcement measures have lain fallow. Members who complained and protested have been "blacklisted" by employers, with no defensive or retaliatory measures being taken by the union. The prevalence of these conditions led the Trustee to concede that the District Council's officials could not have been performing effectively on behalf of the membership.

One particularly disadvantaged group has been the hardwood finishers, of whom there are some 100 to 120 scattered through various locals of the District Council. The members of this group were unable under Rarback even to see the contract under which they worked. Complaints about their pay and working conditions were met with the rejoinder, among others, that they could join the carpenters' union, in which similar workers receive lower pay.

The whole pattern of lax and faithless representation has culminated in recent years in civil and criminal charges against Rarback that he was taking bribes and making collusive agreements with employers. The evidence in the present record goes far in the direction of supporting such charges. But there is no need to conclude now—and the court does not conclude—that they have been sustained. What is important and sufficient here has been the reaction—i. e., non-action—of the Brotherhood and the Trustee to a subject which should obviously be among the most profoundly disturbing ones a union can encounter.

In September 1965, upon leave granted in the preceding month by Judge Cooper, Frank Schonfeld, plaintiff here, and others brought suit in this court (65 Civ. 2695) against Rarback and his appointed Assistant Secretary-Treasurer, Morris Arber, charging that, by conspiracy and collusion with employers, they had agreed to overlook contract violations relating to members' pay and other conditions—in a current word, had entered into "sweetheart contracts." The suit has engaged the attentions of several judges here. Despite the detailed allegations of the complaint, defendants moved to dismiss it for its asserted failure to state a claim. Denying that motion on October 27, 1965, 52 Lab.Cas. ¶16, 722, Judge MacMahon wrote:

> " * * * These allegations are detailed by supporting allegations of facts and acts and, therefore, constitute a sufficient showing of good cause for the issuance of Judge Cooper's ex parte order, lay an adequate basis for jurisdiction, and state a claim upon which relief may be granted. Nor do we find merit in defendants' contention that the complaint contains nothing but conclusions. On the contrary, the complaint alleges a wealth of facts and acts which plainly support a charge of conspiracy. The issues of fact raised by the complaint, however, are numerous and cannot, and should not, be determined upon a motion for summary judgment but must await full development of the facts upon a trial."

Since then, as the undersigned has had occasion to rule and may judicially notice from our files, Rarback has used every conceivable means, including viola-

tion of elementary procedural rules, to delay and obstruct preparation of the case for trial. When Rarback, on deposition, claimed his privilege against self-incrimination in response to questions about anything beyond his name—including questions as to his age and employment, although in his affidavit on file here in another action he asserts his role as Secretary-Treasurer of the Council—George Meany, AFL-CIO President, suggested an investigation by the Painters International President, Raftery, concerning possible violations of the AFL-CIO Ethical Practices Code.[5] General President Raftery proceeded to call a meeting—to which was invited none of the 21 plaintiffs who had filed the complaint of "sweetheart" dealings, held by this court to state a valid claim—at the end of which he concluded that "the complaint involved no charges of misuse of union funds or corruption in any form."

In the meantime, both before and after the filing of the foregoing complaint, widespread charges of corruption against Rarback and other officers in his administration continued to be aired—in the public press, in publications printed and distributed by plaintiff Schonfeld and those allied with him, and in a flood of other litigation to which the Trustee refers as a disruptive factor justifying his assumption of control. Hearings held by a Senate Committee, with which defendants were familiar, developed evidence of "loans" totalling nearly $200,000 in 1960–1961 from one Jack McCarthy, a labor consultant and former union official, to Rarback and former District Council officer Frank Grattano. Whether properly or not, extensive publicity was given to the grand jury inquiries leading to Rarback's indictment on October 18, 1966.

It bears emphasis that the civil and criminal charges against Rarback, the publicity, and the testimony reported in Senate hearings are not treated by this court as proof of the charges against him. They are significant here, to repeat a point of some consequence, because of the demonstration in the record that the International did nothing to explore these vital subjects before the indictment and because the Trustee has done substantially nothing about them since his assumption of office except to suspend Rarback, then give him a key post with a trivial salary cut, and keep in office the whole of Rarback's team without investigating or pretending to judge their accountability for the Council's plight. These are circumstances, in the court's view, casting a glaring light both backward and forward—to the asserted good faith in ordering the trusteeship and to the validity of maintaining it and postponing indefinitely the election of a new Secretary-Treasurer. As has appeared and will appear, however, there is much more in the record to guide judgment on these matters.

### 2. The indictment and ordering of the trusteeship

As noted earlier, General President Raftery moved swiftly upon Rarback's indictment, ordering the trusteeship on the following day, October 19, 1966.

---

5. Pertinent Code resolutions of the AFL-CIO state that "any person is entitled, in the exercise of his individual conscience, to the protection afforded by the Fifth Amendment," and affirm "that this historical right must not be abridged." At the same time, the Federation has declared, when a trade union official "decides to invoke the Fifth Amendment for his personal protection and to avoid scrutiny * * * into alleged corruption on his part, he has no right to continue to hold office in his union." Defendants here have tended to treat the privilege as a complete explanation for failure to explore the allegations of "sweetheart" dealings by Rarback, ignoring both (a) that the union is not a government and (b) that even government is not thus paralyzed in calling upon officials to account for their official performance. See Spevack v. Klein, 385 U.S. 511, 516, n. 3, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967) (opinion of Douglas, J., joined by the Chief Justice and Justices Black and Brennan); id. at 519–520, 87 S.Ct. 625 (Fortas, J., concurring). The net of the opinions in Spevack v. Klein (plurality, concurrence, and dissents) is that a public officer is not shielded by the privilege from inquiries about performance of his official duties.

Members of the Brotherhood's General Executive Board telegraphed (or, in one case, telephoned) their concurrence in this action. In a telegram to the District Council's officers—President Louis Caputo, Vice President Frank Bona, Nathan Flax, Senior Trustee, and Secretary-Treasurer Rarback—Raftery announced and explained this action as follows:

"Pursuant to Section 47 of the Brotherhood Constitution, after careful investigation and with the approval of the General Executive Board, I am hereby placing District Council No. 9, New York, New York, under special Trusteeship effective immediately. In making this decision I have considered the following circumstances.

"Beginning about September 1964 and continuing to date, repeated complaints have been lodged alleging collusive bidding, bribery of public officials and other irregularities in connection with the painting of public housing projects in the area coming within the jurisdiction of District Council No. 9, New York, New York.

"These complaints and allegations received widespread publicity in the daily press of the area which has tended to create an atmosphere of dissension and controversy among the membership of the District Council and has adversely affected the good name, reputation and image of the Brotherhood, The District Council, the Affiliated Local Unions and the industry.

"Reports have been received that the Secretary of District Council No. 9 has been indicted by a New York County Grand Jury for conspiring to rig bids on Housing Authority contracts, that various contractors and Housing Authority officials have been indicted on one count of conspiracy, 42 counts of collusive bidding and 7 allegations of bribing public officials.

"It is the obligation of the Brotherhood under the provisions of the AFL-CIO Constitution and Codes of Ethical Practices to take appropriate action whenever such serious charges are made against any of the officers of one of its subordinate bodies.

"Without passing on the guilt or innocence of the Secretary of District Council No. 9 with respect to the charges contained in the indictments, it is my considered opinion that the foregoing circumstances have made it difficult if not impossible for the District Council to properly and effectively conduct its affairs and that the rights and interests of the members of District Council No. 9 and its affiliated local unions and the Brotherhood are likely to be placed in jeopardy unless immediate action is taken.

"Accordingly I have appointed General Representative John Damery, 335 Savin Hill, Dorchester, Massachusetts, as Special Trustee to take immediate charge and control of District Council No. 9 and its affairs in accordance with the provisions of Section 47 of the Brotherhood Constitution.

"Pursuant to the requirements of Section 47(G) of the Constitution, a hearing will be held within twenty days at which interested parties may be heard on the subject of continuing the special trusteeship."

The LMRDA, Section 301, 29 U.S.C. § 461, requires a report to the Secretary of Labor within thirty days after a trusteeship has been imposed, and semiannually thereafter. President Raftery signed such a report on November 19, 1966, and filed it with the Secretary.[6] The Secretary's form, to be supplied subject to criminal penalties for perjury, calls in item "7" for "applicable reasons for establishing or continuing the trusteeship." Four boxes are given, with

6. The report was supplied by counsel for the Secretary and marked in evidence as Court Exhibit 3.

the applicable one or ones to be checked as follows:

"☐ A. To correct corruption or financial malpractice

"☐ B. To assure the performance of collective bargaining agreements or other duties of a bargaining representative

"☐ C. To restore democratic procedures

"☐ D. Other (Specify):"

As submitted by Raftery, the verified form contains a check only for "B." Then in the space assigned for completing this item "7," the following addendum appears: "See telegram of S. Frank Raftery, General President, annexed." And the telegram quoted above, following a two-page financial statement, is annexed.[7] The omission of a check next to Reason "A"—"to correct corruption or financial malpractice"—is a datum of some interest notwithstanding the appended telegram referring to alleged problems of that sort. It helps to illuminate the Trustee's testimony that in his view the problems of "corruption" were not his particular concern—that he thought it fit, for example, to leave charges of "sweetheart contracts" for the courts to explore and determine. It goes far to explain why, although he could not bring himself to reinstate Rarback to his former position, he reinstated the entire roster of Rarback's cohorts without inquiry a day after their formal "suspension."

### 3. The hearing and determination to continue the trusteeship

In accordance with the International's Constitution and the General President's announcement of the trusteeship, a hearing was held on November 3, 4 and 9, 1966 as to whether the trusteeship should continue. Notice of the hearing was given to plaintiff Schonfeld among others. The transcript of the hearing, running 859 pages, was placed in evidence here by the defendants and has been examined with care.

To judge from that transcript, the hearing was a somewhat wild, disorderly, and rambling business. Long speeches by Rarback (and by two lawyers representing him), his supporters, and his opponents wandered into personal histories, invective, and other unenlightening subjects. The hearing officer, advised by the International's General Counsel, evidently tried to steer an intelligible course, but failed notably, and in substantial measure because inadequate guidance was given as to the dimensions of the hearing or its supposed objectives. For example, the attorney for the District Council and the Trustee—who had represented the District Council and Rarback since 1963, and continued as counsel for the Trustee in this court—placed in evidence Rarback's indictment, gave a list of scores of pending and past lawsuits, and then succeeded in obtaining a ruling, repeatedly reaffirmed with somewhat rigid technicality, that matters touching the pending litigations should be excluded from evidence at the hearing. Since the lawsuits covered a broad range of the conflicts, problems, and alleged corruption in the Council, this remarkable ruling had the effect of excluding much that should have seemed patently relevant on the question whether a trustee was needed or should be retained.

Despite its dubious management and character, the hearing appears to have been conducted in reasonable good faith as an approximate effort to achieve its constitutional objective. Bearing in mind the setting and the character of the participants—all of whom, except for Rarback, were laymen unaided by counsel—the court finds no defect in this pro-

---

7. Under item "8," where space is given to add information "which explains each reason *checked above*" (emphasis added), the form signed by Raftery states: "In addition to reasons cited in the telegram, there is a pending law suit in Federal Court (Westgate Corp. v. District Council No. 9) which seeks nullification of collective bargaining agreements, alleging conspiracy, among other things."

cedure sufficient to warrant invalidation of the trusteeship.

Among the interesting facts developed in the hearing was the quotation—received without objection, later repeated here, and never disputed—of General President Raftery, a day or two after the imposition of the trusteeship, giving his view of Rarback. As thus quoted, he said: "I know Rarback as a strong, capable, competent leader in the New York area but I know nothing of his guilt or innocence of the charges brought against him."

On January 27, 1967, President Raftery distributed his written decision concluding that the trusteeship should continue. Reviewing the history, he recalled that from "September, 1964, and continuing to date, repeated complaints have been lodged alleging collusive bidding, bribery of public officials, and other irregularities in connection with the painting of public housing projects in that area within the jurisdiction of District Council No. 9." He spoke of the adverse publicity caused by these charges, affecting "the good name, reputation and image of the Brotherhood, the District Council, the affiliated Local Unions, and the industry." Concerning the indictment of Rarback and various contractors on October 18, 1966, he said: "Without passing on the guilt or innocence of Martin Rarback, it is clear to me that if the trusteeship had not been imposed, the indictment would have disrupted the administration of the District Council, widened the existing breach among and between members of the District Council, and further cast aspersions on the reputation of the Brotherhoood and its affiliates." He noted the failure to keep District Council bylaws in order. He recalled the existence of numerous lawsuits bearing upon alleged wrongful discipline, violation of members' rights to free speech, election irregularities and charges of libel and slander. He said: "What is indicated then, is not only

membership unrest but lack of due regard for democratic process and procedure within the Council, a present threat to the collective bargaining agreements of the Council, and endless litigation which prevents effective administration." Referring to "sharp divisiveness within the District Council,"—"political in-fighting"—Raftery said that dissident groups "had been all too often obstructive or destructive, rather than constructive." He concluded that majority sentiment favored the continuance of the trusteeship, and ended his written decision with this observation:

> "The trusteeship is necessary to preserve and restore democratic procedures within the District Council, to protect and preserve its collective bargaining agreements, to erase any suggestion of taint or corruption and to carry out the legitimate objects of the District Council and the Brotherhood."

4. The Trustee's account of his stewardship and the proof on this subject

In an initial 44-page affidavit, supplemented by two further affidavits and later by extensive live testimony, the Trustee, John C. Damery, was relied upon for substantially the whole of defendants' case defending the trusteeship against the serious charges and substantial proof submitted by plaintiffs. Much of his affidavit—concerning the reasons for imposing the trusteeship, a matter in which he had no personal part—was patent hearsay. The significant failure of defendants ever to adduce competent proof on this subject is noted again below. Here, however, our primary concern is with the things Damery told of his own knowledge and what the evidence showed on these subjects.

The trustee stressed at the outset of his affidavit his instant suspension of Rarback and the other officers upon assuming the trusteeship.[8] Those other

---

8. As mentioned earlier, a considerable portion of the Trustee's affidavit is devoted to his administration of the worka-

day business of the Council. He expands at length on an organizing drive, on a picketing program, stewards' meetings,

than Rarback, he said, were reinstated "[s]hortly after." More precisely, the evidence showed that all were reinstated within 24 hours, with no investigation, either before or after, of their roles in aiding Rarback's oppressive regime, in condoning the admitted mismanagement of the Council's affairs, in the long history of unenforced contract protection, or in any of the facts leading to charges of "sweetheart contracts" and other corruption.

As to Rarback, the Trustee's opening affidavit said there had been "an outpouring of appeal and protest" over the suspension. Moreover, the General President had been moved by the unfairness of depriving Rarback of his livelihood at a time when he had the burden of meeting unproved criminal charges. "Accordingly, on December 2, 1966, the Trustee, on instructions of the General President, assigned to Rarback (at a salary less than he had earned as Secretary-Treasurer) the task of coordinating the New York City organizing campaign." [9] The new position, the Trustee stressed over and over again, had no special title, little power, and placed Rarback under the close supervision of the Trustee. Rarback was required, he said, to submit weekly reports of his activities. These reports were not volunteered as evidence, but were produced at the court's direction and proved, as will appear hereafter, to be sources of considerable illumination.

As to the title of Rarback's new post, the Trustee's testimony was false. The issue is perhaps of secondary importance in itself, but it begins a train of evasive, misleading, and plainly untrue testimony for defendants. Plaintiffs asserted, and undertook to prove, that Rarback had in his new position the impressive title of "Coordinator of Education and Organization." [10] The Trustee denied that there was any such formal designation. But it appears repeatedly in the Council minutes, signed by the Trustee. Rarback's weekly reports to the Trustee, so much stressed by defendants, are signed by him as "Coordinator." The file in which they were brought to court is labelled "Coordinator's Report to International." The auditor's report of Council salaries for the period ending December 28, 1966, shows "Organizing Co-Ordinator M. Rarback" at the head of the list.

To emphasize Rarback's continued role of leadership under a new facade, plaintiffs offered a document entitled "Program of the Organizing and Educational Department of New York City District Council No. 9," and sought the Trustee's admission that this was Rarback's handiwork. Not so, said the Trustee; it was a joint product, with himself and others sharing authorship, and with Rarback, now subordinated, only one of the participants. But Rarback's weekly reports, produced on demand, gave the lie to this. The very first one, except for one or two typographical errors, later corrected, showed Rarback to be the sole author, precisely as plaintiffs had claimed and as the rest of the membership undoubtedly was led to understand.

educational activities, and improved investment practices. These administrative efforts add substantially to the bulk of the affidavit, but shed little light on the issues genuinely in dispute. The Trustee also enlarges on his repair of the inadequate bylaws, his improvement of auditing procedures, and his efforts to enforce the requirement of employer bonds. These items do in fact suggest improvements in the existing situation, but they are relatively peripheral as against the major problems of laxity, alleged corruption, and undemocratic administration which supposedly gave rise to the trusteeship.

9. The lowered salary, highlighted in the Trustee's parentheses, was proved in the hearing to be $250 weekly as against Rarback's former salary of $275.

10. Rarback himself, in 1960, upon the indictment of a District Council delegate, had obtained immediately the delegate's resignation in order (as Rarback put it at the time) to insure that the man "not embarrass the Union by holding an official post in it until such time as he was vindicated in the Courts." Trusteeship Hearing, D.Ex.M. pp. 427, 430.

Plaintiffs complained that Rarback, equipped with his new title, was continuing to use his position in well publicized appearances at union meetings to attack his opponents, seek financial support for his defense, and otherwise display his continued power. Combining equivocal testimony with professed righteousness, the Trustee gave unimpressive evidence on this general subject. Rarback's evenings, he said, outside office hours, were his own, unofficial time. But Rarback's official reports to the Trustee, presumably on business, tell repeatedly of his speeches and appearances at local meetings, at least some of which were attended by the Trustee himself. The Trustee could not know or much care, he said, how the locals "billed" Rarback's appearances. But *quaere* how this squares with the stated determination to suspend and subordinate the Secretary-Treasurer.

In one respect, however, defendants' uncontradicted testimony sustains their version of Rarback's activities on local rostrums. It appears that the General President did in fact order Rarback early this year to separate his official functions from his appeals for help in his personal defense.

There is more, and more important, evidence, however, refuting defendants' efforts, and the Trustee's testimony, designed to trivialize Rarback's current position. His weekly reports show that he exercised considerable authority over business agents in the central work of organizing and picketing. They show that representatives of key employers continue to deal with him as the effective negotiator and decider, whether or not his decisions need the formal imprimatur of the Trustee. They show that plaintiffs are correct in their assertion that Rarback's continued dominance, and anticipated resumption of the post for which the Trustee has indefinitely postponed an election, must be plain for anyone to see.

In cataloguing his allegedly extensive achievements during the six months or so of his tenure preceding the hearing, the Trustee emphasized that he had corrected the undemocratic condition of the Council's news publication, agreeing that it had formerly been a one-sided organ for Rarback's own uses. The old publication, he swore, has been replaced by a new and impartial one, "published by the Trustee" and under his "control and auspices." What he did not mention—but the evidence at the hearing, including Rarback's reports, revealed—was that the author of the new publication, subject to the editorship of the Trustee, is none other than Rarback himself.

It is not surprising, therefore, that the first issue of the revised "DC 9 Newsletter" carried as its first item a prominent story lauding the new "Organizing and Educational Drive"—Rarback's enterprise—"as a pilot project, that may point the way for strengthening the organization throughout the country." The message, giving national significance to Rarback's role, could easily have told an innocent reader that Rarback's new post was, if anything, loftier than the one from which he had been suspended.

Stressing his asserted impartiality, the Trustee stated several times that he had no initial intention to give Rarback a position during his suspension. The point of this testimony seemed questionable on its face since the Trustee had sworn that the restoration of Rarback to the Council payroll had been "on instructions of the General President * * *." But defendants built upon the Trustee's profession of good intentions by introducing a long series of letters, purportedly from officials of locals affiliated with the District Council, appearing to urge or approve a place for Rarback. Many of the letters were dated after the event, a number after the commencement of this lawsuit. The Trustee, through whom they were introduced, could not identify the writers or their signatures. The letters were received only to show the Trustee had received them. In response to this ruling, the Council's attorney announced the availability of the various writers, pre-

sumably to show the "outpouring" of popular pressure on Rarback's behalf. No such witness was ever called to the stand.

In an evident effort to discount his prompt reinstatement of the whole Rarback regime, the Trustee repeatedly contradicted plaintiffs' testimony that Morris Arber, Rarback's codefendant in the suit charging sweetheart dealings, had served for years as Rarback's appointee in the position of Assistant Secretary-Treasurer. At least, the Trustee said, if this was so he had not heard about it. In the trusteeship hearing, however, at which the Trustee was an interested and steady attendant, Arber was repeatedly referred to as assistant secretary—by himself, by Rarback, and by at least one other speaker. The back issues of the "District Council 9 News"—perused by the court and said by the Trustee to have received his careful study—contain numerous references of the same kind. The National Labor Relations Board, though concerned primarily with a different problem, also described Arber as "Assistant Secretary-Treasurer of District Council No. 9." John Langenbacher Co., Inc., 161 NLRB No. 20, Trial Examiner's Decision, p. 3 (1966). In short, it seems that everyone who knew about the District Council knew Arber's position, except the Trustee. Surely, his counsel in this court, the same attorney who had represented the District Council since 1963, cf. Tucker v. Shaw, 378 F.2d 304, 307 (2d Cir., May 31, 1967), must have known the facts when he presented the Trustee's affidavit denying Arber's possession of the title so uniformly attached to him.

It is enough to say on this subject that the Trustee either testified falsely or revealed a total ignorance of a fact basic to his functioning if he was in truth bent upon probing and curing the District Council's maladies. In either event, his testimony gives striking clues on the question of the alleged good faith behind the establishment and maintenance of the trusteeship.

By private, painstaking, personal investigations, reported in testimony the court finds wholly credible, the plaintiffs proved that the practice of electoral frauds has continued into the period of the trusteeship. They reported careful counts of all those attending local elections in a District Council referendum during March of this year. The evidence showed that the reported votes for the "administration" position on the referendum far exceeded the number of those who had appeared at the polling places. In his affidavit the Trustee complained that plaintiffs had not reported these things before this lawsuit and that this was his first inkling of the alleged irregularities. The matter is to be investigated, he stated, with the investigation of a months-old election still in the future when this court's hearing ended. And, he swore, "a check has been made with the local union officers who denied the allegations categorically."

The Trustee's ignorance of the facts, found here to be facts, requires no comment. His hearsay assertion about what local officers said is followed by a record of live testimony in which no single officer was called by defendants to document the statement.

The evidence also indicates that due process has not flourished under the Trustee. In December of 1966, a trial board appointed before the Trustee's arrival by Caputo, Rarback's aide, imposed heavy fines (of $300 each) upon members charged with infractions of union discipline. Appeals within the organization were futile. It was only after a New York County assistant district attorney stressed to the Trustee his view of the proceedings as grossly unfair that the Trustee acted to suspend the punishments.

Another revealing instance of how the Trustee has functioned is in the testimony relating to the hardwood finishers. As has been mentioned, the substantially undisputed evidence showed a record of high-handed, abusive, and faithless treatment of this group by the Rarback administration. Early in the Trustee's supervision, a representative of the group, speaking for over half of them, undertook to meet with him and explore their

problems. The Trustee stalled at length, then determined that he would meet only with "official" representatives designated by the various locals in which the finishers were scattered. He sent out a call, he testified, for the locals to name representatives to such an official body. To his chagrin, he further stated, hardly any local had responded. As our hearing ended, he was still waiting patiently, still refusing "unofficial" meetings, and still unaware of, or indifferent to, the fact that his ostensible reliance was upon local officials who had ignored or discriminated against the finishers for years. This evidently remains until now the posture of a problem that has led to the grave charges of collusive bargaining in this court's pending case of Schonfeld v. Rarback, 65 Civ. 2695, to which reference has been made earlier.

In the peroration of his original affidavit (p. 42), the Trustee said: "The Trusteeship is necessary to preserve and restore democratic procedures within the District Council, to protect and preserve its collective bargaining agreements, to erase any suggestion or taint of corruption and to carry out the legitimate objects of the District Council and the Brotherhood on behalf of the membership." In their reply brief after the hearing, defendants concluded (pp. 1–2), citing the Raftery telegram of October 19, 1966, "that the allegations of collusive bidding, bribery of public officials and other irregularities in connection with the painting of public housing projects and the fact that the Secretary-Treasurer of District Council No. 9 had been indicted * * * constituted the main bases for the imposition of the Trusteeship." This late assertion of the "main bases" contrasts sharply with the sworn statement, which left unchecked the box next to "corruption or financial malpractice," submitted to the Secretary of Labor. More importantly, it is irreconcilable with the way the Trustee has performed his role and testified about it.

Charges of collusive contracts, he says, though dating back to 1964, must be left for the courts to resolve in pending lawsuits. Though they go to the heart of the long-standing problems of the Council, the pending charges against Rarback have likewise been treated as outside the Trustee's domain, the asserted reason being a supposed concern for the rights of Rarback as a defendant in court. Similarly, all of Rarback's colleagues stay on in positions of control. There have been no charges against them, the Trustee says; for example (Original Affidavit, p. 29): "Caputo was not under indictment and there is no evidence of culpability to warrant a deprivation of job employment to Caputo." On such bland premises, with the Trustee uninterested in seeking relevant evidence, serious questions remain unexplored and unanswered.

As to his professed primary duty of correcting the undisputedly undemocratic practices in the District Council, the Trustee on the stand took a remarkably "impartial" view. He came here, as he saw it, to moderate a destructive "power struggle." With Olympian detachment, he has held the contending forces to the territory they occupied when he arrived. As his original affidavit put it (p. 43), the Trustee "has no interest or inclination to favor any side, pro or anti Rarback." [11] The result has been, of course, to keep the entrenched people in power and to hold at bay those who have fought the lawless administration.

This ungainly posture of supposed "neutrality" is nowhere better illustrated than in the Trustee's colorless catalogue in his affidavit of the many lawsuits over District Council affairs. Carefully and quaintly avoiding any conclusions as to the right and wrong, he merely *lists* the cases, with cryptic references to their subject matter, presumably to show there is "strife" requiring his presence. He lists, for example, Salzhandler v. Caputo, 316 F.2d 445 (2d Cir.), observes correct-

11. The court has resisted unsuccessfully recalling the illustration of absolute neutrality in the old story of the lady who, finding herself a spectator while her unarmed spouse fought a grizzly bear, shouted: "Go it husband! Go it bear!"

ly that certiorari was denied in that case, 375 U.S. 946, 84 S.Ct. 344, 11 L.Ed.2d 275 (1963), and says it was about "the principle of free speech * * *." He does not mention that the action of the trial board in that case, constituted by those still in power, was denounced in the end as violating the principle of free speech. He refers to Yochim and Schonfeld v. Caputo, 61 Civ. 2223, discussed earlier in this opinion, but does not mention the blatant violation of due process found by Judge Murphy in that case. Characteristically, the "merits" are of no interest to him.

In sum, although his mission purportedly includes the restoration of democratic processes in the Council, the Trustee has revealed that this objective amounts to "window dressing" to all practical intents and purposes. In these circumstances, the Trustee's decision—said by him to have been made jointly with Raftery—to allow an election at the end of this month only for offices other than the Secretary-Treasurer's is revealed as part of a larger plan to maintain the political status quo in the Council with the least possible disturbance and without genuine reform. The "freeze" the Trustee has ordered, considered in the light of the way he has handled his stewardship, makes his role in effect one of caretaker for the Rarback forces. The reinstatement of Rarback to a strategic post reenforces this effect. Together with the retention of the whole Rarback apparatus of personnel, it makes probable the return of a Rarback slate to all the places under the one from which Rarback stands suspended. For the membership, long accustomed either to obey or face the retaliatory power of those in charge, will be reluctant to attempt rebellion against a group now at the helm with the apparent strength of the Brotherhood behind them.

### 5. Concerning the "autonomous" locals

In addition to urging that the trusteeship should be enjoined and that an election should be ordered for the post of Secretary-Treasurer, plaintiffs contend that the members of the so-called "autonomous" locals should be excluded from any such election. Their claim is that such locals have been added to the District Council by Rarback to secure his position in elections; that they are in fact largely independent of the Council and its officers; and that they contribute only a minute and disproportionately small per capita share of the Council's funds. Their claim is not without substance, but the proof, at least in this preliminary stage of the case, is insufficient.

The Brotherhood's Constitution provides that locals in trades allied with painting and paperhanging—glaziers, scenic artists, sign painters, etc.,—shall have a large measure of autonomy over their wage rates and other affairs. It also contemplates, Sec. 224(a), that such "autonomous" locals "must be represented in and shall be governed by the rules" of the District Council with territorial jurisdiction over them. The autonomous locals here in question fall under the jurisdiction of District Council No. 9 within the contemplation of the relevant constitutional provisions.

Plaintiffs did produce a witness to whom Rarback, in 1951, had allegedly related his plan to seek power by relying, among other things, upon the votes of autonomous local members. There was, however, no direct evidence beyond this remote episode to sustain plaintiffs' central thesis. Plaintiffs also undertook to show by an analysis of a quarterly auditor's report that the "affiliated" locals, paying to the Council a $5 per month per capita tax, contribute more to the Council's general support than do the autonomous local members, who pay a ten cent per month per capita. It was shown, however, that major expenses borne by the autonomous locals for themselves are paid by the District Council for affiliated locals. Similarly, many functions performed by the District Council for the affiliated locals are performed by the autonomous locals for themselves. In the

last analysis, the disproportion claimed by plaintiffs has not been established.

This is not to say that the evidence adduced by defendants on this subject was impressive. They called one of their accountants, who did much to dissipate the effect of plaintiffs' non-expert testimony, but was unprepared himself to answer the key question as to the disproportion. Although the pertinent information is peculiarly available to defendants, they failed to develop it persuasively.

Nevertheless, the burden is plaintiffs', and they have not sustained it. The result might be different on a fuller hearing, perhaps at a stage later than this preliminary injunction application. At this point, however, the evidence is insufficient to justify the findings and the resulting drastic relief plaintiffs seek.

### 6. General observations concerning the character of the evidence and the state of the record

It may help to explain the court's findings and conclusions if an explicit record is made, even at the cost of repetition, of some pervasive underlying factors.

For the most part, the evidence offered at the hearing by the plaintiffs in support of their serious charges against Rarback, his fellow officers, and the Brotherhood was clear, consistent, careful, and highly credible. These characterizations apply with special emphasis to the testimony of plaintiffs Schonfeld, Blum, and Papson, comprising the bulk of the case against defendants.

On the other hand, as has been noted, the Trustee was poorly informed, evasive, and, too often, plainly incorrect. His performance becomes a critical factor against defendants because of the odd judgment that their entire case in the live hearing could be rested upon him. The judgment is advisedly described as "odd" in that, as noted earlier, he could give no competent testimony concerning the central issues as to the motives and judgments leading to imposition of the trusteeship. Indeed, he made this point more than once on the stand in an apparent effort to justify his vagueness about the purposes of the trusteeship. Evidently recognizing this when they prepared the Trustee's initial affidavit with its hearsay account of these vital subjects, defendants included in their papers an affidavit of President Raftery, who swore briefly that he had read and agreed with what the Trustee said. But when the issues posed by the papers came on to be tried, neither Raftery nor anyone else with personal knowledge was brought to testify and face cross-examination.

As was noted earlier, defendants chose to leave similar vacuums, leading to similarly compelling inferences, on other aspects of the case with respect to which they had tendered paper issues. In the end, they left wholly uncontradicted the demonstration of election frauds under the Trustee's administration. And they failed to fulfill their forecast that the acclaim for Rarback's installation as "Coordinator" would be shown in competent evidence at the hearing.

The record as a whole, even apart from the thoughts of fiduciary responsibility prompted by the very notion of a "trusteeship," leaves the court with a sure conviction that defendants lacked legal justification for the course they followed.

### 7. Primary factual conclusions

To summarize them in terms of the pertinent law, the court's main findings on the issues presented are as follows:

a. The proof is clear and convincing that the Brotherhood has not proceeded in good faith, for any one of the purposes authorized by law, either in establishing or maintaining the trusteeship. The case is difficult on its face because there existed in the affairs of District Council No. 9 ample grounds for imposing a trusteeship. They existed long before October 19, 1966, when the Trustee was installed, with the full knowledge and acquiescence of the Brotherhood. As defendants say, the indictment of Rarback "triggered" the trusteeship declared on the following day; but even then, as revealed by the actions of the Trustee and the silence of the responsible Brother-

hood officials, there was a fatal divergence between the available or asserted justifications and the real grounds for the action.

b. The Brotherhood's President proceeded with considered forethought when he omitted to check on the sworn statement to the Labor Department the factor of corruption and the need to restore democratic procedures as reasons for establishing the trusteeship. The striking omission was not cured by the ambiguous device of appending to the statement his ambiguous telegram announcing the decision. Defendants' later insistence in this lawsuit upon the omitted factors serves only to highlight and aggravate the studied vagueness with which they acted.

c. The primary reason for establishing the trusteeship was to maintain the status quo in the Council as nearly as possible and thwart the efforts of Rarback's opponents to achieve power by democratic means. The Trustee has functioned as an efficient and useful administrator of many of the Council's day-to-day affairs, but has scarcely touched, because he was not intended to touch, the basic evils and unresolved charges that could have justified his role.

d. There is no sound basis in fact for the Trustee's judgment that every office but the main one of Secretary-Treasurer should be open for contest in the forthcoming election. There are knowledgeable and experienced candidates seeking the office. The device of keeping it open, with its powers ostensibly continuing to be exercised by the Trustee, serves no positive end, but is calculated to impair the revival of truly democratic administration.

e. The Trustee's course will have the effect, moreover, of perpetuating the power of Rarback's adherents, all of whom have retained their offices under the Trustee.[12] This likely result is enhanced by the Trustee's action under orders from the General President, installing Rarback in a post of prestige and authority.

f. The Trustee has shown no interest or disposition to investigate promptly and correct election frauds within the District Council. As a result of his inaction, such frauds have characterized the only voting (on a referendum) shown to have occurred during his administration.

g. The evidence is insufficient at this stage to show that the autonomous locals have been employed, contrary to the Union's Constitution, as devices for perpetuating the power of Rarback and his adherents.

## CONCLUSIONS OF LAW

1. The court has jurisdiction of this action to oust an allegedly unlawful trusteeship by appropriate injunctive relief.

Section 304(a) of the LMRDA, 29 U.S.C. § 464(a), provides:

"(a) Upon the written complaint of any member or subordinate body of a labor organization alleging that such organization has violated the provisions of this subchapter (except section 461 of this title) the Secretary shall investigate the complaint and if the Secretary finds probable cause to believe that such violation has occurred and has not been remedied he shall, without disclosing the identity of the complainant, bring a civil action in any district court of the United States having jurisdiction of the labor organization for such relief (including injunctions) as may be appropriate. Any member or subordinate body of

---

12. Compare the Labor Department's study, Union Trusteeships—A Report to Congress (September 1962), placed in evidence by defendants:

"* * * [I]f a trusteeship is validly imposed for one of the statutory purposes, such as the correction of corruption or financial malpractice on the part of certain officers of a subordinate, compliance with the purposes of section 302 may best be secured by removing the officers in question and temporarily appointing others, despite the provisions of title IV." P. 39; see also p. 104.

a labor organization affected by any violation of this subchapter (except section 461 of this title) may bring a civil action in any district court of the United States having jurisdiction of the labor organization for such relief (including injunctions) as may be appropriate."

A few decisions have held that the statute requires exhaustion of the remedy offered through the Secretary of Labor before any "member or subordinate body" may proceed in court. Cox v. Hutcheson, 204 F.Supp. 442, 446 (S.D. Ind.1962); Flaherty v. McDonald, 183 F.Supp. 300, 304–306 (S.D.Calif.1960); Rizzo v. Ammond, 182 F.Supp. 456, 472 (D.N.J.1960). But neither the language of the statute nor its history will bear this construction, as is shown by the weight of entirely convincing authority. United Brotherhood of Carpenters, etc. v. Brown, 343 F.2d 872, 880–881 (10th Cir. 1965); Executive Board, etc. v. International Brotherhood of Electrical Workers, 184 F.Supp. 649, 655–659 (D. Md.1960); Hotel and Restaurant Employees v. Del Valle, 328 F.2d 885, 886 (1 Cir.) cert. denied, 379 U.S. 879, 85 S.Ct. 146, 13 L.Ed.2d 86 (1964); Parks v. International Brotherhood of Electrical Workers, 314 F.2d 886, 923–924 (4th Cir.), cert. denied 372 U.S. 976, 83 S.Ct. 1111, 10 L.Ed.2d 142 (1963); Forline v. Helpers Local No. 42, 211 F.Supp. 315, 319 (E.D.Pa.1962); Vars v. International Brotherhood of Boilermakers, 204 F. Supp. 245, 246–247 (D.Conn.1962). The Labor Department appears to agree with the obviously sound view of the latter authorities. See Union Trusteeships, supra, note 12, p. 5. And defendants do not press with vigor their contrary suggestion.

It is sufficient to refer to, without repeating here, the thorough analysis by Judge Watkins in Executive Board, etc. v. International Brotherhood of Electrical Workers, supra, demonstrating that plaintiffs are plainly correct in their jurisdictional argument.

2. The formal procedures establishing the trusteeship were lawful.

Section 304(c) of the LMRDA, 29 U. S.C. § 464(c), provides in pertinent part:

"(c) In any proceeding pursuant to this section a trusteeship established by a labor organization in conformity with the procedural requirements of its constitution and bylaws and authorized or ratified after a fair hearing either before the executive board or before such other body as may be provided in accordance with its constitution or bylaws shall be presumed valid for a period of eighteen months from the date of its establishment and shall not be subject to attack during such period except upon clear and convincing proof that the trusteeship was not established or maintained in good faith for a purpose allowable under section 462 of this title."

Plaintiffs contend that the presumption of validity for eighteen months is unavailable to defendants for three reasons:

(a) Because the trusteeship was not established by the Brotherhood "in conformity with the procedural requirements of its constitution and bylaws * * * "

(b) Because the hearing of November 3, 4 and 9 was not a fair one.

(c) Because the hearing was not "before the executive board or before such other body as * * * provided" in the Brotherhood's Constitution.

While at least the second of these arguments is substantial, the court has concluded that all three must be rejected.

a. Plaintiffs assert that the Brotherhood Constitution, Section 47, authorizes trusteeships over local unions, but not over district councils. Defendants are correct in their short answer that subsection (i) makes the provisions of Section 47 applicable "with equal force and effect to District Councils and other subordinate bodies of the Brotherhood."

b. A more difficult question is posed by plaintiffs' charge that the trusteeship hearing was not fair—spe-

cifically, because of the large areas excluded by the rulings of the Hearing Officer under the guidance of the Brotherhood's General Counsel. As the court has indicated earlier, the rulings were indeed erroneous in barring discussion of anything involved in the mass of pending litigation, and thus foreclosing, in theory at least, the great bulk of the District Council's bitter problems. In some measure, the rulings undoubtedly reflect some of the studied ambiguity attending President Raftery's explanation of the reasons for appointing a trustee. Nevertheless, having in mind that the standards of due process for a lay tribunal are undoubtedly less nice than those governing the courts, it cannot be said that the truncated quality of the hearing should in itself defeat the trusteeship. The exclusionary rulings were not meticulously enforced. In the course of the somewhat rambling and hectic proceedings, many of the grievances and disputes received at least a partial airing. Enough was developed so that the deciding authority, if bent upon a determination in good faith, might have been deemed adequately informed for that purpose.

There is a certain artificiality, of course, in judging the fairness of the hearing in isolation from the rest of the case. The court has done so, however, in order that the several factors for decision may be stated with a decent approach to clarity. Having done so, the court holds that if the complaint about the adequacy of the hearing stood alone, the relief plaintiffs seek would be denied.

c. Because the hearing was before a single officer, plaintiffs say it violated the statutory requirement of a "hearing either before the executive board or before such other body as may be provided" in the union constitution or bylaws. The notion of a "body," plaintiffs argue, is not satisfied by a one-man tribunal, so that neither of the statutory alternatives was satisfied. The argument is plausible in strictest dictionary terms, but it cannot prevail in the end.

There is no question that the designation of a single hearing officer conformed to the Brotherhood's Constitution, Section 47(g). There is likewise no question that a hearing of this sort, familiar in the workings of official tribunals, contains no basic defect offensive to due process requirements. See Utica Mutual Insurance Company v. Vincent, 375 F.2d 129 (2d Cir. 1967). And it seems clear, whatever the awkwardness in the use of the word "body," that such a formally authorized procedure fulfills the essential requirements of Section 304 (c), LMRDA.

As originally proposed, the predecessor of this provision, S. 505, 86th Cong., 1st Sess., Sec. 204(c) (1959), would have made the presumption available only if the trusteeship had been "authorized or ratified by the executive board or similar governing body of the labor organization."[13] As the section was reported, however, the phrase "similar governing body" was replaced by "such other body."[14] In the course of making this and the other revisions leading to the final form of the section, the draftsmen had before them authoritative information that it was common practice for the president of an international union to order "a hearing before him or his deputies, with there being a subsequent right of appeal to the executive board."[15] And the Senate Report on the presently pertinent language as it was ultimately passed described the purpose "to make it plain that an honest decision by the international officials is not to be overturned during the first 18 months of the receivership upon a question of fact

---

13. See Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, Titles I–VI. p. 650 (Department of Labor 1964).

14. Id. at p. 657.

15. Comments of AFL-CIO President Meany, Hearings before a Joint Subcommittee of the Committee on Education and Labor, 86th Cong., 1st Sess., p. 1492 (1959).

or of degree or of judgment as to the necessity for imposing it." [16]

■ When the history and purpose are examined, it seems clear that only an arid literalism would be served by outlawing the Brotherhood's perfectly apt constitutional procedure because a single officer is not normally referred to as a "body."

In sum, while the court rules in plaintiffs' favor on the substantive basis next considered, their procedural arguments against the trusteeship and the presumption of its validity have not been sustained.

· ■ 3. The record supplies clear and convincing proof that the trusteeship was not established, and has not been maintained, in good faith for a lawful purpose. This conclusion follows, of course, from the findings recorded above. As was stated there, the conditions existing in District Council No. 9 for at least several years before October 1966 would probably have justified a good-faith trusteeship for one or more of the purposes validated by Section 302 of the LMRDA, 29 U.S.C. § 462, which provides:

"Trusteeships shall be established and administered by a labor organization over a subordinate body only in accordance with the constitution and bylaws of the organization which has assumed trusteeship over the subordinate body and for the purpose of correcting corruption or financial malpractice, assuring the performance of collective bargaining agreements or other duties of a bargaining representative, restoring democratic procedures, or otherwise carrying out the legitimate objects of such labor organization."

The evils to which these lawful purposes relate were the subjects of constant complaints to the Brotherhood during the several years before the Trustee was named. The complaints were almost uniformly futile. The Brotherhood knew of, and tacitly condoned, Rarback's arbitrary methods, his effective quelling of protest, his dictatorial control of the Council's news publication, and the widespread indications of possible corruption. Nothing was done until Rarback was indicted.

Then, overnight, the Trustee was named.

While there might be plausibility in the Trustee's explanation that the indictment simply "triggered" a righteous explosion to which events had in any event been building, the record as a whole compellingly refutes this explanation. The Trustee's stance of "impartiality" between Rarback and his opponents, the bland re-installation of the Rarback team, the new assignment to Rarback and the false and evasive testimony about it, the whole pattern of inconsistent and equivocal explanations—all point to the conclusion that there has been bad faith, not good faith, that the trusteeship was imposed to keep the entrenched group in power rather than for one of the allowable purposes.

This conclusion, convincingly demonstrated with respect to the Trustee's activities, applies equally and inescapably to the determination creating the trusteeship. Apart from all the other evidence, the absence of testimony from Raftery or anyone else responsible for the establishment of the trusteeship reflects a striking and calculated decision to curtail obviously pertinent inquiries. To be sure, plaintiffs had a heavy burden of proof—to make "clear and convincing" the claimed invalidity of the trusteeship. But it might have been supposed—the Congress must be deemed to have supposed—that the statute "would require the international officer to justify such action [ordering a trusteeship] when it becomes necessary * * *." [17] And it

---

16. S.Rep. No. 187, 86th Cong., 1st Sess. (1959), in Legislative History, supra note 13, p. 658, U.S.Code Congressional and Administrative News, p. 2318.

17. Congressman Santangelo, commenting on the substantially identical predecessor to Section 304(c) in the Kennedy-Ives bill, S. 3974, 85th Cong., 2d Sess., Sec.

ought certainly to have seemed "necessary," in the face of the damaging picture developed by plaintiffs, to have tendered explanations from those whose good faith was directly in issue.

Giving due weight to the inference from the Brotherhood's silence, the evidence as a whole sustains the burden plaintiffs assumed.

4. The appropriate remedy is to postpone the partial election now scheduled, order a supervised election for all offices, including that of Secretary-Treasurer, and then terminate the unlawful trusteeship.

Upon the findings heretofore made, the election scheduled for June 24, 1967, excluding the office of Secretary-Treasurer, would entail unfair advantages for the discredited Rarback group. Since it is held that the post of Secretary-Treasurer should be included among those to be contended for, and since the period before June 24 is too short for nominations, let alone campaigning, the plainly required course is to postpone the entire election. Following consultation with the parties,[18] and subject to further orders as may be required, the date for the election thus postponed will be September 16, 1967.

■ As has been found, the history of District Council elections, extending into the period of the trusteeship, has been marked by fraud and other irregularities. Provision should be, and will be, made to guard against such happenings in the forthcoming election. There is no serious question raised as to the power of the court to effectuate its decree in this way. The LMRDA, Sec. 304(a), 29 U. S.C. § 464(a), provides in familiar terms for "such relief (including injunctions) as may be appropriate." The flexible

relief available in equity is an old story. It plainly extends, as will the order herein, to supervision by an impartial officer or agency over a court-ordered election. Boggia v. Hoffa, 41 CCH Lab.Cas. ¶16,-731 (E.D.N.Y.), modified and affirmed, id., ¶16,732 (2d Cir. 1960); cf. English v. Cunningham, 106 U.S.App.D.C. 70, 269 F.2d 517, 521, cert. denied 361 U.S. 897, 905, 80 S.Ct. 195, 4 L.Ed.2d 152 (1959); and see Summers, Judicial Regulation of Union Elections, 70 Yale L.J. 1221, 1253–56 (1961).

■ There is no invasion by such a provision of the exclusive jurisdiction reserved to the Secretary of Labor under Title IV of the LMRDA, 29 U.S.C. §§ 481–82. See Calhoon v. Harvey, 379 U. S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964). The basic relief here is the invalidation of the trusteeship, found to have been unlawfully established and maintained. The election to be ordered is "appropriate" as a corollary and incident of the primary relief to be granted.

As has been mentioned, nominations for District Council offices are made in the local unions, with an election in any local where there is competition for a candidacy. Thus, the votes for contested nominations are an integral part of the election process leading to the designation of a Secretary-Treasurer. It follows that the supervision to be ordered will apply to the election in any local where there is a contest for the nomination for Secretary-Treasurer.

The entire election process, including any such contested nominations, will be supervised by the American Arbitration Association (A.A.A.), 140 West 51st Street, New York, N. Y. 10020, and will be subject to that agency's election rules, except to the extent that any of them may

---

204(c) (1958). Legislative History, supra note 13, p. 649.

18. On June 14, 1967, the court met with counsel, including representatives of the Labor Department, announced informally the rulings to be embodied herein, and invited assistance on the problems of scheduling, supervision, and related aspects of the order to be entered. While

carefully reserving their several objections to the court's rulings, counsel were most helpful in arguing out the implementing details. The court is especially indebted in this respect, as in others, to counsel for the Labor Department, whose views and assistance are reflected in the provisions outlined herein for inclusion in the order.

be inconsistent with the terms of the court's order or applicable law. In the election to be scheduled for September 16, 1967, the A.A.A. will arrange for the counting and tabulation of the votes separately for each local union. The election results will be certified to the court, whereupon a further order will be settled enjoining the continued functioning of the Trustee and encompassing such other and additional relief as the circumstances may then justify.

The costs of the A.A.A.'s supervisory services, for reasons which have been canvassed at some length with counsel, will be borne in equal shares by the defendant District Council and the defendant Brotherhood. On or before August 21, 1967, these defendants will deposit with the A.A.A. the sum of $2,000 as partial payment toward the total of such costs.

Pending the election and installation of the Secretary-Treasurer, with the concurrence of the parties, the Trustee will remain in his current status, subject, of course, to further orders of the court if any are necessary. The Trustee will supply to the A.A.A. and the parties such information and assistance as may reasonably be requested to ensure orderly preparation for, and conduct of, the election process. He will, for example, publish and distribute appropriate notices and information; make available, conveniently and impartially, membership lists for the distribution of campaign literature; and proceed in other suitable ways to further the objective of a fair and open election. Should the incumbent Trustee become unavailable during this interim period, the Brotherhood will be responsible for the appointment of a successor within 48 hours, giving prompt notice of such appointment to the court and counsel for the parties.

While some particulars have been mentioned, the court deems it unsuitable and unnecessary to attempt now to prescribe in minute detail the procedures to be followed and the obligations of the parties in administering such procedures.

As has been emphasized in conferences with counsel, further details of compliance are left to the parties in the expectation that mutual good faith and cooperation will obviate the need for any substantial degree of additional intervention. The principles to be observed and the objective to be sought in the election process ought to be clear enough. Experienced counsel should be able to collaborate effectively toward the fair and faithful implementation of the court's order.

If this expectation should fail, the court will be open to resolve such problems or controversies as may arise during the time for compliance.

5. The evidence, as found above, does not sustain plaintiffs' claim that the autonomous locals have participated unlawfully in District Council elections and should be excluded from the election scheduled for September 16, 1967. Accordingly, the members of these locals will be entitled to vote as they appear to have done since 1951.

Having found the facts on this issue against plaintiffs, the court has deemed it unnecessary to close definitively with defendants' contention that the matter is outside our jurisdiction in any event. It may be noted, however, if only as a tentative conclusion, that there seems to be merit in plaintiffs' theory that their effort to exclude the autonomous locals is within the court's pendent jurisdiction. Cf. Libutti v. Di Brizzi, 343 F.2d 460, 461 (2d Cir. 1965). Thus, the disposition at this stage is without prejudice to any claims plaintiffs may press on this subject at some later point in the lawsuit, although it should be acknowledged that their position *after the election* may be decisively affected by the exclusivity provisions of Title IV, LMRDA, 29 U.S.C. § 483. Robins v. Rarback, 325 F.2d 929 (2d Cir. 1963), cert. denied 379 U.S. 974, 85 S.Ct. 670, 13 L.Ed.2d 565 (1965). By the same token, nothing decided now will preclude any appeal plaintiffs may deem warranted under that Title to the Secretary of Labor.

Pursuant to our agreed schedule, counsel will serve and file proposed orders on June 20, 1967, with a view to the court's determination of any controversies on that score and entry of its order on the following day.[19]

19. At defendants' request, the question of a bond is postponed to the time for settlement of the order.