Frank SCHONFELD, Individually and as Secretary-Treasurer of District Council 9, International Brotherhood of Painters and Allied Trades, AFL–CIO, Plaintiff,

v.

John PENZA, as Chairman and member, et al., Defendants.

Isaac SCHWARTZ et al., Plaintiffs,

v.

Morris LEVY, Individually and as President of District Council No. 9, International Brotherhood of Painters and Allied Trades, AFL–CIO, Defendant.

Nos. 72 Civ. 2837, 72 Civ. 4971.

United States District Court,
S. D. New York.

Dec. 7, 1972.

Martin Raphael, New York City, for plaintiff Schonfeld.

Julius S. Impellizzeri, New York City by Julius S. Impellizzeri and William Hoppen, New York City, of counsel, for Schwartz.

Nierenberg, Zeif & Weinstein, New York City by Michael F. Dennis, New York City, for defendants Penza & Levy.

BRIEANT, District Judge.

By an order to show cause issued September 29, 1972, in 72 Civ. 2827, plaintiff, Frank Schonfeld, sought to restrain defendants, pending trial of this action, from effectuating the decision of a Trial Board of District Council No. 9 of the International Brotherhood of Painters and Allied Trades, dated September 15, 1972, which removed him from his position as elected Secretary-Treasurer of District Council No. 9, after a hearing held pursuant to formal written charges. The Trial Board also declared him ineligible to seek re-election for a five year period.

On October 10, 1972, a hearing was held with respect to that application. The Court continued the temporary restraining order granted by the aforesaid order of September 29, 1972. The hearing was thereafter resumed on October 11, 1972. At that time the temporary restraining order was continued in effect and further hearing held on October 18, 1972.

At that time, with the aid of the Court, a stipulation was entered into on the record in lieu of a preliminary injunction pending trial. It was agreed in substance that plaintiff Schonfeld would continue in office, that he would exercise his powers concurrently with Morris Levy, President of the District Council, and would exhaust his intra-union remedies by prosecuting his appeal from the decision of the Trial Board of District Council No. 9 to the General Executive Board of the International Brotherhood.[1] Pending the outcome of the appeal, the matter was continued.

On November 17, 1972, that Board entered a decision in effect sustaining the findings of guilt by the Trial Board. The General Executive Board modified the punishment meted out to Schonfeld by District Council No. 9's Trial Board. It removed Schonfeld from office as Secretary-Treasurer, effective that day, for

---

1. Schonfeld has now exhausted all remedies reasonably available to him within the District Council or the International. *Cf.*

Robins v. Schonfeld, 326 F.Supp. 525 (Levet, J., D.C.1971).

the duration of his term, expiring on the date of the first council meeting in July, 1973, directed the District Council to conduct an immediate election (January) and determined that "Brother Schonfeld may not run for the position of Secretary-Treasurer in the forthcoming election to fill the vacancy, but may run for that position or any other office in the next regular election, with respect to which nominations are to be made in May, and the election to be held in June of 1973."

On or about November 22, 1972, Isaac Schwartz and others, rank and file members of local unions affiliated with the District Council, initiated the second above entitled action, 72 Civ. 4971. An order to show cause dated on that day and returnable November 28, 1972 was issued bringing on a motion by Schwartz, et al. for a preliminary injunction restraining defendants from carrying out the proposed disciplinary action, or interfering with the right of Schonfeld as Secretary-Treasurer to carry out his duties. A hearing was held in both actions on the motions for preliminary injunctions pending trial, and by a Memorandum and Temporary Restraining Order issued November 30, 1972, this Court restrained the defendants for a period of ten days or until the further order of this Court, from implementing or otherwise carrying out the disciplinary action. Such temporary restraining order contained limitations and provisions as therein more fully set forth, which however are not material to the determination of the motions.

District Council No. 9, International Brotherhood of Painters and Allied Trades, AFL–CIO, is a regional council or administrative group consisting of approximately 28 local unions in the City of New York. Such local unions include (1) affiliated or so-called "painters locals" for which the District Council provides collective bargaining and related services, (2) autonomous locals in special branches of the craft, such as sign writers, scenic artists and glaziers, which conduct their own collective bargaining, choose and pay their own business agents, and accordingly pay a smaller capitation or head tax to the District Council than the affiliated locals do, and (3) there may be some locals which could be described as "semi-autonomous", such as maintenance painters and paper-hangers.

Schonfeld, as Secretary-Treasurer, is the only officer of District Council No. 9 who is elected by the vote of all of the members. There are presently pending, among other District Council litigation, two causes, Fritsch et al. v. District Council No. 9, and Schonfeld v. Raftery et al., D.C., 359 F.Supp. 380. These cases were consolidated for trial, have been tried before me and are pending decision. They relate generally to the job of Secretary-Treasurer and arise out of determined but unsuccessful efforts by Schonfeld to effectuate a "painters section" within the District Council, or alternatively, to circumscribe the functions of the Secretary-Treasurer, or alter the method of selecting him.

Schonfeld has served as Secretary-Treasurer since his election in 1967. He was re-elected in 1970. Although as noted, the Secretary-Treasurer is elected by the vote of all members of the affiliated locals of District Council No. 9, all other officers of District Council No. 9 are elected by vote of the delegates to the District Council. The delegates are elected in turn by the members of the local unions they represent. And, each local is represented by a number of delegates roughly proportional to its total membership. It can be seen, accordingly, that the Secretary-Treasurer is, by reason of his election throughout the craft, the district officer closest to the rank and file in terms of the democratic process. He is also the most powerful.

The Court will not characterize the prior experiences of the District Council before the coming to office of Schonfeld. Schonfeld, with some justification, and with the concurrence of Schwartz, et al., characterizes himself as a reformer, intent on bringing honest and fair dealing to the union, and zealous in his long

struggle for the rights of the rank and file. Morris Levy, President of District Council No. 9, has in contrast, said of Schonfeld "Your Honor, he is not the Savior, not the God over everybody. This is what his whole actions have been." (Tr. October 18, 1972, p. 13.)

The Court has no part in this underlying intra-union political controversy. The accusations made against Schonfeld are typical of those indignities visited upon reformers and zealots the world over. Nothing herein contained should be deemed a judicial taking of sides between or among the two or more elements whose generation of factionalism and litigious conduct has unfortunately been visited upon this honored craft.[2]

While the Court in the trial of the Fritsch case had admonished counsel not to mention the name of Martin Rarback, it is now necessary to do so, and to revert briefly to pre-Schonfeld conditions in District Council No. 9.

Accordingly, reference is had to the findings and conclusions of Judge Frankel of this Court, reported in Schonfeld v. Raftery, 271 F.Supp. 128, aff'd 381 F.2d 446 (2d Cir. 1967).[3]

As Judge Frankel noted, Martin Rarback, as Secretary-Treasurer, had enjoyed a dictatorial regime for more than 20 years, during which the constituent union membership was "poorly served and frequently betrayed". Schonfeld had the temerity in 1961 to run for the position of Secretary-Treasurer. He was unsuccessful. He was made the subject of intra-union discipline by a trial board, resulting in conviction and fine. Other charges and more punishment were threatened by Rarback.

Judge Murphy of this Court, after a review of the trial board record, enjoined enforcement of that punishment and prevented the filing of further charges. He remarked "We are compelled to agree . . . that 'if this be due process the moon is made of green cheese'." Yochim and Schonfeld v. Caputo and Rarback, October 24, 1962, 61 Civ. 2223 (not officially reported, but quoted by Frankel, J. in Schonfeld v. Raftery, 271 F.Supp. at p. 132).

The conflict continued. Litigation was commenced in this Court by Schonfeld and others against Rarback (65 Civ. 2695) charging conspiracy and collusion with employers. Evidence of misconduct was developed before a U. S. Senate Committee. Rarback was indicted on October 18, 1966 for criminal misconduct in connection with union activities, and the International Brotherhood placed the District Council under trusteeship effective the following day. In doing so, International President Raftery announced, among other things, "beginning about September, 1964 and continuing to date, repeated complaints have been lodged alleging collusive bidding, bribery of public officials and other irregularities in connection with the painting of public housing projects in the area coming within the jurisdiction . . . ."

As a result of the trusteeship, all District Council officials and employees, except Rarback remained in office. As Judge Frankel observed (p. 138 of 271 F.Supp.): ". . . the evidence showed that all were reinstated within 24 hours, with no investigation, either before or after, of their roles in aiding Rarback's oppressive regime, in condoning the admitted mismanagement of the Council's affairs . . . and other corruption." On December 2, 1966, for

2. The Court has made assiduous efforts to bring harmony to the Council and terminate this bitter and costly family fight. Such efforts include conferences with the parties, their attorneys, past and present, and with general and local counsel to the International Brotherhood. When Mr. Raftery, International President, was in New York to testify as a witness in the Fritsch case, this Court directed him to breakfast with Schonfeld in an effort to discharge his obligation as a peacemaker. He did so, willingly, and while the sincerity of his efforts to bring the warring factions together cannot be doubted, he has been unsuccessful, at least to date.

3. This case is 67 Civ. 1361, litigation not directly related to Schonfeld v. Raftery, 70 Civ. 2544, previously mentioned.

various reasons detailed by Judge Frankel, Rarback was also restored to the District Council payroll.

Judge Frankel has detailed in full the condition in which the District Council found itself, characterized by factionalism, strife and litigation, following the institution of the trusteeship, and the removal of Rarback. These days were also characterized by unlawful restraints upon the right of freedom of speech of union members and officers, *cf. Yochim, supra* and Salzhandler v. Caputo, 316 F. 2d 445 (2d Cir.), cert. denied 375 U.S. 946, 84 S.Ct. 344, 11 L.Ed.2d 275 (1963).

The District Council was divided into cliques and factions, highly politicized and extremely bitter against each other.

Judge Frankel terminated the trusteeship and in doing so held that he could act, in support of the franchise of the rank and file, and in the interests of justice, without the necessity of an exhaustion of administrative remedy offered through the Secretary of Labor pursuant to § 304(a) of Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 464(a). See 271 F. Supp. 128. His conclusion was affirmed on appeal, 381 F.2d 446 (2d Cir. 1967).

Judge Frankel held that the trusteeship was not established and had not been maintained in good faith for a lawful purpose; that there had been bad faith in the exercise of the trusteeship "imposed to keep the entrenched group (Rarback's) in power" (p. 147 of 271 F. Supp.); that notwithstanding Title IV of the LMRDA vesting exclusive jurisdiction in the Secretary of Labor, a court of equity could invalidate the trusteeship and order an election as a corrolary of and incident to the primary relief to be granted. The Court did so.

Schonfeld was elected Secretary-Treasurer.

It was too much to expect that the factionalism and extreme bitterness which had characterized union affairs during the years in which Schonfeld was seeking the office, and District Council affairs were controlled by Rarback or those friendly to him, would suddenly cease with the election of Schonfeld, and it didn't. Nevertheless, Schonfeld was re-elected in 1970.

It serves little purpose to catalog all the lawsuits which have been continued, or initiated in the years since Judge Frankel's decision. They are most numerous.[4]

## I

### JURISDICTION

Plaintiff found jurisdiction on Subchapter II of LMRDA, 29 U.S.C. § 411 et seq. Subchapter I of that statute, § 401(a), protects the right of the rank and file to "choose their own representatives". Section 411(a)(1) gives to Schwartz, et al. the right "to nominate candidates and to vote in elections . . . of the labor organization . . . subject to reasonable rules and regulations in such organization's constitution and bylaws." Subparagraph (2) thereof gives every member the right to express any views and opinions, again, subject to established and reasonable rules.

Section 412 gives to any person whose rights are secured by that subchapter of the Act a remedy by civil action in this Court for such relief, including injunction, as may be appropriate.

To the extent that the penalty imposed on Schonfeld (removal from office and disqualification as a candidate

---

4. Besides those elsewhere mentioned, they include:

(1) Giraldo and Schonfeld v. Rosen, D.C., 355 F.Supp. 54, a contest over signatory powers in a union pension trust, pending before the late Judge McLean of this Court, and since reassigned to Judge Ward; (2) Rosen, et al. v. Amalgamated Bank of New York and Schonfeld, Supreme Court of the State of New York, Queens County, Index No. 10843/1972, since removed to E.D.N.Y. as 72 Civ. 1129, pending before Judge Neaher; and (3) District Council No. 9, etc. v. Rosen, 72 Civ. 3021, in this Court, in which the complaint was dismissed on jurisdictional grounds by Judge Lasker on July 27, 1972.

in a special election to fill the vacancy) is based upon proceedings not in accord with the Constitution and By-Laws of the International Brotherhood or the District Council, or is of such a transparent and insubstantial nature insufficient to warrant the penalty imposed, but brought instead out of bad faith and vindictiveness,' the rights of the rank and file members under subchapters I and II of the Act have been violated. Removal of a duly elected union official under improper circumstances and before expiration of his term, and disqualification of such official as a candidate for re-election is an interference with the right of the rank and file to vote for candidates of their own choice as guaranteed by the Act.

█ If the activities of the anti-Schonfeld clique are intended to chill Schonfeld's free speech, or the freedom of speech of other members who may be deterred by the difficulties experienced by Schonfeld, such activity is also actionable at the instance of Schwartz, et al.

In Mamula v. Local 1211, United Steelworkers of America, 202 F.Supp. 348 (W.D.Pa.1962), the Court held that 29 U.S.C. § 411(a)(5) confers jurisdiction on the district court if a union official who has been removed from office is also prohibited from holding office for a specified time. The prohibition is an interference with the removed officer's status as a union *member* under 29 U.S.C. § 411(a)(5).

The same reasoning was followed in Martire v. Laborers' Local Union 1058, 410 F.2d 32 (3rd Cir. 1969). In that case, a business manager of a local union was removed from office and barred from holding office in the union for five years after his removal. The prohibition against holding office was held to affect his status as a union member, under 29 U.S.C. § 411(a)(5). See also, Grand Lodge of Machinists v. King, 335 F.2d 340 (9th Cir. 1964); Yochim, *supra*; Schonfeld v. Raftery, 271 F.Supp. 128 (Frankel, J.), aff'd 381 F.2d 446 (2d Cir. 1967); Schonfeld v. Raftery,

335 F.Supp. 846 (Lasker, J., D.C.1971), and prior cases involving this union, therein cited; Robins v. Schonfeld, 326 F.Supp. 525 (Levet, J., D.C.1971); Gleason v. Chain Service Restaurant, etc., Employees Int'l Union, 422 F.2d 342 (2d Cir. 1970); Vars v. International Brotherhood of Boilermakers, etc., 320 F.2d 576 (2d Cir. 1963).

Defendants urge that deprivation of the right to nominate and vote for Schonfeld is, as to plaintiffs Schwartz, et al., a violation of § 481, which is not actionable in the first instance by this Court, but with respect to which administrative remedies must first be exhausted by filing a complaint with the Secretary of Labor, who alone may seek the aid of this Court. Defendants assert that this Court has no jurisdiction to grant the plaintiffs the remedy they seek since they have come to the wrong forum and should have complained to the Secretary of Labor.

█ Relying on the distinctions suggested by Judge Lasker in Schonfeld v. Raftery, 335 F.Supp. 846, 852, we reject this suggestion. On the facts hereinafter found, it would seem beyond argument that the equal rights to nominate candidates granted to Schwartz, et al. by § 411(a)(1) of the Act and which are concededly actionable in District Court under § 412 thereof, have been infringed. At least there is reasonable ground so to believe, and the circumstance presents a fertile field for litigation, so as to support the provisional remedy of an injunction pending trial.

█ At the very least, plaintiffs Schwartz, et al., have a reasonable probability of success on the trial in founding jurisdiction on § 412, without the necessity of exhausting remedies which they may have with the Secretary of Labor under § 482, relating to conduct of an actual election.

In the meantime, the rank and file are not to be prejudiced by a failure to preserve the subject matter until the Secretary of Labor may determine his own jurisdiction, and act if so advised.

The Court concludes that there is jurisdiction over the subject matter of this application pursuant to 29 U.S.C. §§ 401, 411 and 412, and further that such jurisdiction is not negated by the exclusive jurisdiction granted in election cases to the Secretary of Labor under § 482 of the Act.

Even assuming the Secretary of Labor has exclusive jurisdiction, these rank and file plaintiffs are not to be penalized by their incorrect choice of a forum, if that is what they did, and the Court has pendent jurisdiction to issue and maintain a preliminary injunction pending trial until such time as the Secretary of Labor can investigate, consider his own jurisdiction and make an informed disposition of such matters which may hereafter be laid before him. Nothing is presently pending in the Department of Labor with respect to the issues presented to this Court.

## II

## PROBABILITY OF SUCCESS

A. *The Charges and Denials.*

At a meeting held February 28, 1972, local union # 874, a constituent local, or "member" of District Council No. 9, voted to prefer charges to the effect that:

"Brother Schonfeld by-passed the agreement committee of the District Council and the District Council delegates. His decision to grant our jurisdiction to a sister local was never approved by either. The evidence of this act is in the printed trade agreement which is specifically covered on page 7(b) captioned 'Tapers Local 1974'. Frank Schonfeld also misrepresented the facts in presenting this matter to the District Council delegates as was stated in a letter of the General President of Jan. 24, 1972."

The charge comprised violation of § 266(5), (6), (7), (8), (12) and (15) of the General Constitution and Article II, Sections 1 and 2, Article XIII, Sections 3 and 9 of the District Council By-Laws.

On March 3, 1972, local union # 51 voted to bring charges:

"Brother Schonfeld granted our jurisdiction to local 1974 of the Tapers, without the permission or approval of this local or the D.C. Our agreement committee members report they were never told of this action until they seen it in the printed agreements."

Local union # 51 also charged the Secretary-Treasurer with having misrepresented the facts "as was stated in the letter of our General President S. Frank Raftery of Jan. 24, 1972."

Local union # 905 preferred charges by completing an undated "charge blank", a printed form in use in the District Council, which the General Executive Board of the International Brotherhood has found was filed on or about March 3, 1972. Local union # 905 presented its charge as follows:

"Frank Schonfeld, through exercise of his power as Secretary-Treasurer of District Council No. 9, Exceeded and abused that power granted him in our By-Laws and Constitution. This unlawful act will result in the loss of wages for the painters, also the loss of much needed monies for the fringe benefits funds, such as the Pension & Welfare Funds. The loss of countless thousands of days labor in the future for our painters. Frank Schonfeld by-passed the agreement committee of the District Council and the District Council Delegates, who are authorized by the District Council By-Laws to negotiate and approve any agreement consumated (sic) between the union and the employers. His decision to grant jurisdiction of our work to another local, thereby causing us to loose a great amount of work, was never approved by either the committee on negotiations or the District Council Delegates. The evidence of this act is in the printed trade agreement which is specifically covered on p. 7 ¶(b) captioned 'Tapers Local 1974'.

Frank Schonfeld also misrepresented the facts in presenting this matter to

the District Council Delegates, as was proven in the letter of the General President of Jan. 24, 1972."

Schonfeld admitted signing the paper referred to, and consistently urged before the Trial Board of the District Council that the charges were politically motivated, that they were a form of reprisal and intimidation against him and against other members who support various litigation which he had initiated or continued, and asserted that he was being denied due process.

### B. *The Procedure Within the Union.*

The District Trial Board tried Schonfeld over a period beginning on April 29, 1972 and ending August 30, 1972. No lawyer was permitted to participate, and these highly articulate combatants consumed 3,317 pages of stenographic transcript at considerable cost to District Council No. 9 and its constituent members, but without shedding any great light on the issues. Schonfeld contributed his share to the chaos which characterized the Trial Board proceedings, but he was not alone.

The District Council Trial Board purported to act under § 261 of the Constitution of the International Brotherhood, which provides as follows:

"District councils shall have original jurisdiction to hear and try charges filed against *any member or officer of any local union* affiliated with that district council for violation of the by-laws, trade rules and regulations of the district council, or for violations of the Constitution of the Brotherhood, or for violations of the by-laws of a local union which also would constitute violations of the by-laws of the district council or of the Constitution of the Brotherhood."

Section 262 following the above, grants exclusive jurisdiction of a complaint of one or more local unions (which this was) "over the management of a district council" to the General Executive Board (of the International Brotherhood, in Washington).

Plaintiffs contend that Schonfeld was not being tried for his activities as a "member or officer of a local union affiliated with the District Council" within the meaning of § 261, but rather was being tried for his activities in connection with the management of a District Council, and should have been tried by the General Executive Board. The General Executive Board has not specifically determined this issue, except to the extent that it held in its decision dated November 17, 1972, that "the General Executive Board has considered all other defenses raised by the appellant and found them to be without merit and not worthy of separate discussion."

The plain meaning of § 262 does suggest that the District Council was without jurisdiction to determine such charges, and that such charges should have been tried in the first instance before the General Executive Board, which apparently has exclusive jurisdiction under § 262. This contention was raised before the trial began.

■ Proceedings, in the absence of a felony conviction, in derogation of the right of the only elected official to serve out his term should be strictly construed.

■ As to this point, that the Trial Board lacked subject matter jurisdiction, plaintiffs show a reasonable probability of success.

### C. *The Trial Was Not Before a Fair and Impartial Trial Board.*

■ Section 268 of the Constitution of the International Brotherhood permits, optionally, that the members of the Executive Board may constitute the Trial Board, but also provides for "disinterested members" to sit.

There is reasonable ground to believe that the Trial Board of the District Council was not impartial.

Originally, the Trial Board would have included Morris Levy, President of the District Council. Levy, who has been at odds with Schonfeld, but who bears him no personal malice, candidly

stated to the delegates at a meeting of the District Council on April 4, 1972, that the General Executive Board of the International Brotherhood should take original jurisdiction because "he cannot find one man on the District Council 9 Board who is not prejudiced."[5] According to the minutes, Levy stated that he would not sit on the Trial Board (because of a preconceived opinion), and that Penza should not sit because his local #874 had brought the charges. Penza disregarded Levy's suggestion. Schonfeld had asked for a public board of prominent citizens acceptable to both sides to hear the charges impartially, but although this procedure could have been initiated under the By-Laws, it was not done.

Dissenting Trial Board member Loria's September 27, 1972 affidavit, not contradicted, tells us that before the proceedings had been completed, each other member of the Trial Board told Loria Schonfeld was guilty, and thereby indicated a foregone conclusion as to the outcome. This in itself is persuasive evidence that the Trial Board was not impartial. Falcone v. Dantinne, 420 F.2d 1157 (3rd Cir. 1969).

The decision on appeal, of the General Executive Board, in disposing of Schonfeld's claim that he did not have a fair hearing, said:

"The appellant says that the Trial Board was biased. The record does not support that contention. He failed to challenge the Trial Board members before the trial. At the outset of the trial, he was permitted to question each Trial Board member at great length regarding his possible disqualification. What emerged was evidence that some Trial Board members had either opposed Schonfeld politically, or had opposed his stand on certain issues unrelated to this trial, at one time or another. It was also shown that these same Trial Board members had supported Schonfeld politically or on issues at one time or another. Politics is a way of life in District Council No. 9. If this were to be a standard by which to measure disqualification, it would be virtually impossible to find an unbiased Trial Board for a trial of any official on the local or Council level. The Trial Board members discussed this point at length on the record and in executive session and decided that no grounds had been shown to justify their disqualification. We agree."

However, the Trial Board record indicates that it had decided to reject Schonfeld's challenges to bias, even before he was allowed to question the members. The Chairman of the Trial Board, John Penza, stated (p. 49):

"And I say this, that no member of this Board, regardless of what you may think, that they should disqualify themselves. And you can put that in the record, that this Board is going to continue with the trial."

From this statement, it is clear that Penza had made up his mind that the Board would remain as then constituted, no matter what evidence of prejudice was adduced by Schonfeld.

On page 96 of the transcript, Schonfeld's challenge to member Vastano was disposed of solely on Vastano's own assertion that he would be able to give Schonfeld a fair trial. This procedure is contrary to the "Suggestions for Proper Conduct of Trials by Local Unions and District Councils", published by the International Brotherhood. Mr. Schonfeld read the relevant provision of these Suggestions to the Trial Board at his hearing:

"If the person challenged does not feel there is sufficient cause to disqualify himself, then the matter should be referred to the Trial Board for determination." (p. 4 of Suggestions, pp. 152, 153 of transcript.)

---

5. While the Court cannot accept Mr. Levy's statement as determinative of the state of mind of the other Trial Board members, there is reason to believe that his analysis was correct.

Thus, under the trial procedures suggested by the International Brotherhood, the ruling on the disqualification of Mr. Vastano should have been made by the entire Trial Board.

The Trial Board also denied Schonfeld's request that members of the union be allowed to attend the trial as long as they behaved in an orderly fashion. (pp. 3-5 of transcript.)

The record of Schonfeld's trial shows that the members of the Trial Board were often extremely evasive in answering Schonfeld's questions with regard to their previous union political activities. For example, Mr. Presser, when asked what office he occupied in the "League of Union Painters" during the June, 1970 election campaign for Secretary-Treasurer, responded that he "did not remember". (p. 199 of transcript) In addition, the Trial Board members frequently interrupted Schonfeld's questioning in that area with comments on matters not directly relevant to the subject of bias, and obviously intended to harass and obfuscate.

John Penza, Chairman of the Trial Board, and Presser and Vastano, who together represented majority rule on the Trial Board and voted to convict, had a long history of political opposition to Schonfeld, and took the opposite view of the underlying litigation concerning the attempt to establish a painters section. They had opposed Schonfeld's re-election actively in the June, 1970 election. Penza had written an article calling Schonfeld "false, dishonorable and immoral" and had urged that his administration be "kick[ed] out from office . . . has always betrayed the interests and confidence of the members." Penza's own local # 874, which he represents on the Council, had brought the charges which were being tried.

Presser, another member of the Trial Board, is or was the President of the "League for Union Painters", an inter-nal political faction opposed to Schonfeld's election in 1970 and presumably still opposed. Presser had been a supporter of Rarback. He ran unsuccessfully in March, 1962 for office as trustee of an insurance fund and was defeated by a candidate supported by Schonfeld.

The basis for the claim of bias is opposition on issues unrelated to this trial. Politics, particularly when indulged in with the singleness of purpose historically present in District Council No. 9, *is a standard by which to measure judicial disqualification when an elected official is sought to be removed for sins and omissions not constituting moral turpitude.*

It would be impossible without a full plenary trial to reach valid and binding conclusions as to the partiality or bias of members of the Trial Board, three in number, who voted against Schonfeld. However, there is reasonable cause to believe, based on the foregoing facts, that on a plenary trial plaintiffs will be able to show such partiality.

D. *Charges Not Substantial and Not Sufficiently Specified.*

■ The charges are two-fold, first, that Schonfeld in his capacity as Secretary-Treasurer "voluntarily signed an agreement with local 1974 and the employers whereby work previously performed by painters was defined as falling within the jurisdiction of tapers." (p. 7 G.E.B. decision.) It is charged that he did so without seeking the approval of the Council's [trade] Agreement Committee or the Council delegates. A second and separate charge is that he "led the delegates to believe that the International union had been responsible for the clause in question."

Under the Constitution of the International Brotherhood, the General Executive Board determines craft jurisdiction of the Brotherhood, and within the Brotherhood. It was beyond Schonfeld's

power to give away jurisdiction. On oral argument we are told that "the fact remains, he did it."

The General Executive Board has never ruled on the refined jurisdictional point involved in this case.[6]

6. The August 16th addendum to the trade agreement, upon which the charges are based, reads as follows:

"August 11, 1971

Local 1974 shall have jurisdiction of the taping on new construction and of Bulk Taping. Bulk Taping shall consist of taping in excess of 750 square feet of drywall surface. In addition, Local 1974 shall have jurisdiction of the spackling and pointing of unpainted concrete ceilings and the troweling of textured materials.

D.C. 9 shall have jurisdiction of taping on other than new work on jobs which involve the taping of areas of drywall surface not in excess of 750 square feet. In addition, D.C. 9 shall have jurisdiction of the spackling and pointing of previously painted concrete ceilings and the spraying of textured materials and simulated acoustical material.

|  | Frank Schonfield Secy Treas. | John Alfarone |
|---|---|---|
| Louis Elkins | D.C. #9 Intl Bro of Ptrs & Allied Tr. | Bus. Rep. Local |
| Executive | | 1974, Int Bro |
| Secretary, Assoc. | | of Ptrs & Allied |
| of Master ptrs & Dec. of the city of N.Y., NYC. | | Tr. |

Harry Altman Gen Rep. Bro of Ptrs & Allied Trades"

The underlying contentions as to jurisdiction arise from the fact, as stated by General Representative [of the International] Harry Altman, at the October 12, 1971 District Council meeting, that in New York City, because of longstanding custom, the spraying of simulated acoustic paints or textured materials, and certain "non bulk" spackling, pointing and taping, was considered in the jurisdiction of the painters. Altman said in October that the tapers had agreed that the definition of taping incidental to painting which in New York belongs to the painters, would be spelled out to include jobs of not more than 750 square feet of wallboard. Throughout the country, tapers claim jurisdiction over pointing and preparing of concrete ceilings, but conforming to New York area custom, the tapers conceded through Altman in October, 1971, that once a coat of paint has been applied, this work belongs to the painters. Work rules require that where ceilings are sprayed, a prime coat must first have been applied in the regular manner. By letter dated January 14, 1972, the International President refined the allocation further with respect to "minor" pointing and "nicks and scratches".

The tapers local union came into existence as a result of proceedings before the N.L.R.B. The International issued the charter to Tapers Local #1974, and on May 28, 1970, authorized tapers in mixed painters locals to receive "Clearance Cards for immediate deposit into Local Union 1974". Schonfeld had assisted the tapers in getting the charter and making the transition from an independent labor organization to an autonomous local of District Council No. 9.

Schonfeld had taken the position throughout the controversy that with regard to the spackling of nicks or scratches on drywall, whether or not there is a coat of paint on the drywall, that work constitutes preparatory work for painting and is therefore, "clearly within the jurisdiction of the painters." See District Council Board minutes of October 12, 1971, which were in evidence before the General Executive Board of the International.

These minutes indicate that these jurisdictional questions remained at issue and were being discussed in District Council meetings with General Representative Altman present, long after the alleged offense was committed on August 16, 1971. Further correspondence between the International President and District Council No. 9 between August, 1971 and April, 1972, in evidence before the General Executive Board, indicates that all parties assumed the allocation of jurisdiction remained at all times subject to the further and different determination of the International. This was conceded at the Trial Board, Vol. 28, p. 2787 and Vol. 15, p. 1725.

A memorandum dated April 4, 1972, sent by Schonfeld to General President Raftery, places the underlying issues in context. Schonfeld wrote in part as follows:

"An item which seems to be causing a great deal of heat, in my opinion based more on politics than on reality, is the question of the pointing and

Reasonable grounds exist to believe that Schonfeld did accomplish an allocation of jurisdiction, but that the power of the International to reallocate is unimpaired; he did so indirectly, by including jurisdictional provisions in the industry-wide bargaining agreement with the employers, and that he did so because as the General Executive Board characterized it "the parties were acting 'under the gun' of the August 15, 1971 'wage-freeze' ". The trade agreement, without a tapers' clause had been signed August 11, 1971 and sent to the Construction Industry Stabilization Committee for approval. It became essential to have the entire agreement, including the tapers' question, which had been left out of the agreement, resolved so that the wage agreement could be considered a "pre-freeze" contract. An August 16th supplemental memorandum agreement, for the signing of which Schonfeld was found guilty, was dated August 11th, the same date as the trade agreement, and related back to it. On August 16th, there was no negotiating committee in existence with which the matter could be cleared. The addendum by which the jurisdictional provision was resolved was signed by Schonfeld, by Harry Altman, an "observer" acting for the International Brotherhood and by John Alfarone, for the Tapers and Louis Elkins, representing the employers. No charges were placed against the other signatories.

It would appear obvious that Schonfeld's act could not oust the International Brotherhood from its ultimate jurisdiction to resolve the underlying issues between the tapers and the painters and so, in a sense, the charges are vague and misleading because they charge Schonfeld with doing something which he had no power to do. The General Executive Board did not directly pass on the assertion that Schonfeld acted in good faith, and at least within the knowledge of Altman, representing the International Brotherhood, who co-signed the addendum, and that Schonfeld did so in order to vest the industry wide wage agreement as a pre-freeze contract.

This Court cannot pass upon the merits of the charge and should avoid appearing to do so, but the inference is inescapable that the charge raises a colorable issue, emotionally appealing to painters who claim to have lost work thereby, but actually merely raised as a smoke-screen to give a basis to oust Schonfeld from office and prevent him from running for re-election.

As to this aspect of the case plaintiffs also show a reasonable probability of success.

E. *Unavailability of Exculpatory Evidence.*

John Alfarone and Harry Altman were unavailable as witnesses. Altman had participated in the signing of the tapers' agreement and in the discussions leading up to it. He refused to come. The Trial Board apparently concluded it could not compel his presence.[7] In his

spackling of concrete ceilings. Since it was agreed that the spraying of such concrete ceilings with textured materials and paints is the work of the painter, and since such spray permits are not issued unless they are first primed by brush or roller, in practice the pointing and spackling is actually done by the painter. It was stipulated that the tapers would not do any pointing or spackling once the ceiling was primed.

Both Brother Harry Altman and Brother John Alfarone state that in fact tapers were not doing any pointing or spackling of ceilings.

If this item were removed from political distortion by stipulating that pointing and spackling of painted and unpainted concrete ceilings is the work of the painter, it would do much to calm the situation. Even though the Trade Agreement has been printed, there would be no problem getting the employers and District Council No. 9 to agree to this modification."

---

7. The parties before me assumed that the attendance of Altman and Alfarone before the union Trial Board could not be compelled. This is far from clear. We think

absence, however, it is very doubtful if a just result could have been achieved, even assuming an impartial Trial Board. To a lesser extent, the same is true of Alfarone.

It is also a part of the charges that Schonfeld was guilty of "intentionally misleading" the Council delegates as to his responsibility. As stated at p. 7 of the General Executive Board's determination, it is said that he "led the delegates to believe that the International Union had been responsible for the clause in question. Although the General Executive Board found this to be a deliberate misrepresentation, it appears that it is also a reasonable argument, in view of the unexplained presence of Altman, in the nature of a moderator or observer for the International, and Altman's signature thereto. The record is not clear as to the purpose of Altman's signature. The Trial Board never found out.

It is a serious charge when an official of a District Council is accused of misrepresenting the position of the International. As to the punishment therefor, the General Executive Board of the International could hardly be said to be disinterested, for if local or district council officials are permitted to misrepresent the position of the General Executive Board or the International President, dissension will wrack the entire craft and it will be impossible for the International officers to function. As two charges are dealt with together, the misrepresentation as to the International's position, and the giving away of jurisdiction, it is impossible to tell which of the charges resulted in what portion of the penalty imposed, and to what extent.

F. *Statute of Limitations.*

There is a 45 day limit on the bringing of charges. Section 269 of the International Constitution so provides. The 45 day period begins after the occurrence of the alleged violation, or when its occurrence became known, or should have been known.

The jurisdictional difficulties arise out of an act which took place on August 16, 1971. The record before me conclusively shows and without contradiction, that the disputed clause was read by Schonfeld at a meeting of the District Council on September 15, 1971, and that the minutes of the meeting were transcribed and became generally known immediately thereafter.

Local Union # 51 protested by letter to Schonfeld dated November 5, 1971, and advised that a motion had been made at its meeting to modify the jurisdictional provisions. Under date of September 28, 1971, Local Union # 74 advised Schonfeld in writing that it "went on record unanimously not to accept the Council minutes of September 15, 1971 in its entirety, reason—tapers jurisdiction." On September 17, 1971, Local Union # 905 went on record to reject the minutes, again, on the subject of "giving away our jurisdiction."

It would seem clear that Schonfeld's activities in connection with the tapers' jurisdiction were indisputably known to the charging parties for much more than 45 days prior to the date that the charges were first filed.

The situation may be different as to the alleged misrepresentation of the position of the International, but since the two elements were charged jointly and dealt with together, both by the Trial

---

the New York State Supreme Court has inherent and statutory power, in an action or special proceeding brought in that court for that purpose by Schonfeld or his adversaries, to issue its subpoena to require attendance of a witness, either before it, or the trial board, in aid of the proper administration of justice. See 6 Carmody-Wait 356 (1953 ed.); Weinstein Korn & Miller, New York Civil Practice

¶ 2302.4; C.P.L.R. §§ 2302, 3102(e), 3101(a)(4); Judiciary Law §§ 2–a, 2–b, McKinney's Consol.Laws c. 30.

Futhermore, Article XIII, Section 10 of the District Council By-Laws provides that a witness failing to appear in connection with any trial, after notice by registered mail, may be fined. Apparently, no attempt was made to invoke this sanction.

Board and by the General Executive Board on appeal, it is impossible to separate that part of the complaint which is time barred from the portion which might be otherwise.

The General Executive Board held that charges could not be filed until it was known who was responsible for the violation. But Schonfeld was a signer of the allegedly . violative instrument (along with Altman and Alfarone, neither of whom were charged). The General Executive Board held that the General President's letter of January 24, 1972 had made it clear (for the first time) that the General Executive Board had not been responsible for the agreement in question.

Complainants knew or should have known that the General Executive Board would not act through or by means of the signature of the Secretary-Treasurer of the District Council. This argument is transparent.

When time barred charges are joined with charges which are not time barred, and tried together and disposed of together by a single punishment, it is doubtful whether due process and adherence to the reasonable provisions of the Constitution and By-Laws permits any such finding to stand.

### G. *Free Speech.*

Was conduct of the Trial Board and charging parties intended to, and did it, inhibit free speech in the union?

Plaintiffs and Schonfeld charge that the free political association and free speech and other rights of democratic process guaranteed to them by the union constitution and by-laws and by the statute, have been violated under form of law, by preparing and trying invalid charges against Schonfeld in order to oust him and to deprive the rank and file of the exercise of their franchise, and by example, to deter others. The validity of this claim cannot be determined without a full plenary trial. Set against the long prior and current experiences in the District Council with respect to litigation and considered in

light of the threat of more and additional charges against Schonfeld, here again, plaintiffs show fair ground for litigation.

### H. *Effect of Intra-Union Appellate Review.*

The decision of the General Executive Board dated November 17, 1972 is on its face a well reasoned and carefully drawn document. Plaintiffs, apparently out of respect for the General Executive Board and International President, are restrained in their attack on it. The General Executive Board has a direct, personal interest in that portion of the charges which relates to the alleged misrepresentation and "leading to believe" by Schonfeld with respect to the position of the International Brotherhood. This seemingly unrelated charge was simultaneously asserted by all three separate charging parties, Locals # 51, # 874 and # 905, possibly by coincidence, but possibly for the precise purpose of inflaming the International President and General Executive Board against Schonfeld. Its joinder with the rest of the charges makes this aspect of the case difficult. *Cf.* Vars v. International Brotherhood of Boilermakers, 320 F.2d 576, 578 (2d Cir. 1963).

Furthermore, a careful appellate review can lend no sancity to the actions of the Trial Board of original instance, if that Board lacked jurisdiction of the subject matter, or was biased, or if any other substantial defect exists with respect to it.

If there were no inherent defects in the actions of the Trial Board, we would consider ourselves bound by the decision of the General Executive Board. Union disputes ought to be resolved through union machinery, and ordinarily are not a proper subject for the courts. But in this particular instance, the abuse of process in the District Council as against Schonfeld, appears so egregious that we cannot in equity treat the subsequent decision of the General Executive Board as removing these de-

fects, or lending validity to proceedings originally invalid.

## I. *Excessive Penalty.*

■ The General Executive Board has observed correctly that this case does not involve corruption or moral turpitude. The General Executive Board correctly observed that there are "some mitigating circumstances", and that ". . . we are reluctant to deprive the electorate of the freedom to choose among all available candidates for the period of time specified by the Trial Board."

Furthermore, the General Executive Board in effect has imposed a penalty on the rank and file and on Schonfeld, by requiring the holding of a Special Election in January, when, in any event, the regular election must be held in May. It must be obvious that Schonfeld probably cannot litigate his rights to a final conclusion before the passage of time will make them academic. It is expensive to the District Council to hold an additional or special election, and an unnecessary burden insofar as concerns any candidate who may be successful in the January special election, but will have to commence campaigning immediately, in the highly charged political atmosphere of District Council No. 9, for re-election in May, 1973. Plaintiffs are aggrieved by the duplication of electioneering which detracts the attention of the officials from day-to-day union affairs. On this score also, plaintiffs show a probability of success.

## III

## CONCLUSION AS TO PROBABILITY OF SUCCESS

None of the foregoing should be deemed to be a final adjudication on any of the points set forth, but based on all or any of them, it would appear obvious on the record before me that plaintiffs show a reasonable probability of success, sufficient to justify the provisional remedy of a preliminary injunction pending trial.

## IV

## IRREPARABLE DAMAGE

### A. *Generally.*

This Court has questioned whether Schonfeld himself showed irreparable damage. He should have an adequate remedy at law, in that he may, if successful, recover money damages from his persecutors, if in fact that is what they are, and may be compensated adequately for all lost perquisites of office, including salary, with interest, Court costs, and possibly exemplary or punitive damages, this if his cause is what it appears to be and is so found after a plenary trial.

■ The position of the rank and file Schwartz plaintiffs is different. They assert rights protected by statute, the value of which is not measurable in money. While Schonfeld may have no right under the statute to retain union office, the rank and file do have the right to nominate and vote for him, and the deprivation of that right is so significant as not to be compensable in money, and something entitled to the protection of a court of equity. These plaintiffs are irreparably damaged, and have no adequate remedy at law. To assert such damage, the Schwartz plaintiffs do not need to sue as a class action, and their attempt so to label the case is disregarded.

### B. *Trust Fund Litigation.*

■ There is another element of irreparable damage present; the union has various trust funds which are administered by Schonfeld and others. Schonfeld holds his position as a trustee *ex officio*, and will cease to have a voice in the trust fund administration if he is ousted as Secretary-Treasurer.

There is litigation pending with respect to such funds in the Eastern District of New York and elsewhere.[8] Sum-

8. See footnote 4.

mary removal of Schonfeld for any period of time, however short, will result in that litigation becoming moot, and will dispose of it on a basis other than a full and fair decision on the merits.

This Court has not considered the merits of any of that litigation pending before others, and expresses no opinion with respect to the merits thereof. Regardless of the merits, it is in the interests of the rank and file and the beneficiaries of the trusts, that such litigation be resolved on its merits by a court, rather than being rendered moot by the removal of Schonfeld.

The existence of this other litigation and the necessity to preserve jurisdiction of it, is another element of irreparable damage. This is not to say that a new Secretary-Treasurer elected in May, could not compromise or discontinue, if so advised.

## V

### CONCLUSION

Plaintiffs show that they are entitled to a preliminary injunction pending trial, or pending the further order of the Court, which will enjoin the defendants from putting into effect the disciplinary actions ordered by the General Executive Board on appeal from the decision of the Trial Board, dated November 17, 1972, and which will stay the removal of Schonfeld from office and stay and enjoin the conduct of a special election.

The Court's previously imposed limitations which require Schonfeld to act concurrently with Morris Levy, President of the District Council, are continued for the purpose of balancing the equities. They will remain in full effect as previously outlined in the Memorandum and Temporary Restraining Order, dated November 30, 1972.

The present bond or undertaking appears adequate, and is continued.

The foregoing constitutes findings of fact and conclusions of law, pursuant to Rule 65, F.R.Civ.P.